## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | ) |
| | ) |
| | ) Adv. Pro. No. 21-03423 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HARLAN H. CHAPPELLE, MICHAEL E. ELLIS, TIM J. TURNER, JAMES T. HACKETT, PIERRE F. LAPEYRE, JR., DAVID M. LEUSCHEN, and DONALD DIMITRIEVICH, | ) |
| | ) **Jury Trial Demanded** |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

Plaintiff David Dunn, as Trustee of the AMH Litigation Trust (the "**Trust**"), the successor-in-interest to certain causes of action of Alta Mesa Holdings, LP ("**Alta Mesa**"), brings this action against Alta Mesa's former fiduciaries Harlan H. Chappelle, Michael E. Ellis, Tim J. Turner, James T. Hackett, Pierre F. Lapeyre, Jr., David M. Leuschen, and Donald Dimitrievich (collectively, the "**Directors and Officers**").

## INTRODUCTION

1.     Alta Mesa was an oil and gas exploration and production company that filed for bankruptcy in September 2019 after losing hundreds of millions of dollars and writing off billions of dollars in assets. Alta Mesa's bankruptcy would have been avoided had its fiduciaries acted in good faith and exercised the requisite care in operating the business.

1

2.      Pursuant to Alta Mesa's limited partnership agreement, the Directors and Officers, as the ultimate persons in control of the partnership, owed Alta Mesa the duty to act "in accordance with the standards of the industry" and perform their fiduciary duties "with ordinary prudence and in a manner characteristic of a businessman in similar circumstances."[1] The Directors and Officers, however, did not act with ordinary prudence. Instead, they recklessly caused Alta Mesa to commit to a costly oil and gas drilling program in 2018 (the "**2018 Drilling Program**") that the company had no reasonable basis to pursue.

3.      The 2018 Drilling Program was funded, in large part, by a cash influx from investors as part of a February 2018 transaction (the "**Business Combination**") in which Silver Run Acquisition Corporation II ("**Silver Run**"), a special purpose acquisition company, acquired Alta Mesa and a related company, Kingfisher Midstream, LLC ("**Kingfisher**"). Silver Run acquired Alta Mesa and Kingfisher for $3.8 billion, with roughly $2.25 billion allocated to the purchase of Alta Mesa. Silver Run's investors approved the purchase on the belief that Alta Mesa was a "leader in operating costs and capital efficiency" and that its historical operations had proven the "full development" of its oil and gas resources. Neither, however, was the case.

4.      When the Business Combination closed in February 2018, Alta Mesa received more than $500 million in cash from Silver Run, which was renamed Alta Mesa Resources, Inc. ("**AMR**") and became Alta Mesa's indirect parent. This cash should have served as the foundation for Alta Mesa to conduct further well "spacing" and "pattern" tests (as described below) to determine the most cost-effective and profitable drilling strategy. Moreover, that $500 million

---

[1] More specifically, and as further set forth below, each of the Directors and Officers were directors and officers of Alta Mesa Resources, Inc., Alta Mesa's ultimate controlling parent. Three of those Directors also served as Directors/Managers of Alta Mesa Holdings, GP LLC, the general partner of Alta Mesa. Because the Directors and Officers controlled Alta Mesa Holdings, GP, LLC, and were the human actors ultimately responsible for managing Alta Mesa, they owed Alta Mesa a similar duty to act "with ordinary prudence."

could and should have amply provided for years of sustainable drilling and compounding growth as Alta Mesa's oil and gas reserves were steadily developed over time. The Directors and Officers, however, eschewed further testing and wasted this massive influx of cash—along with additional assets—on the reckless 2018 Drilling Program, placing Alta Mesa on a foreseeable—if not inevitable—path to bankruptcy.

5.      The 2018 Drilling Program focused on the development of new oil and gas wells in the "STACK"[2] area of Oklahoma. The Directors and Officers approved the 2018 Drilling Program based on the assumption that each newly drilled well would have, on average, an estimated ultimate recovery ("**EUR**") of approximately 250 thousand barrels of oil. (Each one thousand barrels of oil is commonly referred to as "**MBO**."). But it was completely unreasonable for the Directors and Officers to assume that Alta Mesa's newly drilled wells would have an EUR of 250 MBO, or anything approaching it, because Alta Mesa had no reliable historical evidence supporting that assumption.

6.      The majority of the new wells Alta Mesa planned to drill would be so-called "child" wells—wells drilled in close proximity to established, producing wells, known as "parent" wells. Drilling wells in proximity to established, producing wells posed known risks given some of the basic scientific principles involved in oil and gas development and production. In particular, drilling wells close together may cause "interference" between the wells, resulting in lower production and reduced EUR from the child wells.

7.      By February 2018, Alta Mesa had no evidence to support the assumption that new child wells would have an EUR of 250 MBO. In fact, Alta Mesa had considerable evidence that

---

[2] "STACK" refers to Sooner Trend (oil field), Anadarko (basin), and Canadian and Kingfisher counties.

its existing child wells were markedly less productive than their parent wells, which themselves barely had, on average, an EUR of 250 MBO.

8.       Nonetheless, Alta Mesa's Directors and Officers blindly, recklessly, and inexplicably assumed that the child wells Alta Mesa contemplated as the core of the 2018 Drilling Program would have an EUR equal to the preexisting parent wells. Alta Mesa's Directors and Officers further assumed, with no evidentiary support, that Alta Mesa could drill as many as twelve wells in each section of the oil field without compromising the EUR of the wells in that section.

9.       Without a reasonably accurate average EUR for each proposed well, "upstream" oil and gas companies (companies that explore, drill, and extract oil and gas) such as Alta Mesa cannot make rational investment decisions. The net present value ("**NPV**") of an oil field depends, among other things, on optimizing the number of wells while accounting for the drilling cost of each well, the expected production of each well, and the resulting expected revenue. Alta Mesa's Directors and Officers were grossly negligent in failing to support the 2018 Drilling Program and its massive expenditures with any optimization analysis. And the Directors and Officers were reckless and grossly negligent in aggressively ramping up drilling operations—at tremendous cost to the company—before having the evidence necessary to formulate an economically sound drilling plan.

10.      Before the Directors and Officers approved the 2018 Drilling Program in February 2018, Alta Mesa had completed seven so-called "test patterns" to determine how many wells it could drill per section and the projected EUR of those wells. But ***only two*** of those test patterns involved the completion of child wells around preexisting parent wells—the type of drilling pattern that formed the foundation of the 2018 Drilling Program.

11.     The other five test patterns involved the drilling of several new wells at the same time, which Alta Mesa referred to as "sibling" wells. And unlike the two test patterns of child wells, which had five and ten wells per section, respectively, the sibling test patterns only had three to four wells per section. In other words, the five sibling patterns had a lower total density per section than the other patterns in the drilling tests. And, more importantly, these five sibling patterns had a lower total density per section than the drilling patterns Alta Mesa planned to complete as part of the 2018 Drilling Program. The lower density test patterns were thus unrepresentative of what could be expected from the drilling patterns planned for the 2018 Drilling Program.

12.     Both of the test child patterns, each of which had multiple child wells drilled around one or two existing parent wells, were extremely disappointing, underperforming projections by a large margin. The average EUR for the child wells in these patterns was materially below the 250 MBO EUR on which Alta Mesa's 2018 Drilling Program was based. Alta Mesa's Directors and Officers were aware of the poor performance of the test child patterns—the only child wells that they had actual data for—but they chose to ignore these results.

13.     The results of the five test sibling patterns also failed to confirm the production assumptions underlying the 2018 Drilling Program. Only two of the five sibling patterns had an average per-well EUR of around 250 MBO. Those patterns, however, had ***only three wells per section***. While Alta Mesa did not plan to immediately drill twelve wells per section across its acreage, the 2018 Drilling Program anticipated that Alta Mesa would drill many patterns with six or more wells per section. That is, Alta Mesa assumed it could generate 250 MBO per well from patterns with double, triple, or even quadruple the number of wells per section than the test sibling

patterns that had managed to hit that level of production. Such assumptions were patently unreasonable.

14.     Based on the results from test patterns—which, at best, showed only that Alta Mesa could drill three or less sibling wells per section without compromising per-well production—Alta Mesa's Directors and Officers recklessly assumed that the company could engage in high density drilling per section—*i.e.*, up to twelve wells per section—without any deterioration in per-well EUR. But there simply was no credible basis for the Directors and Officers to assume that a pattern of three wells would have the same EUR per well as a more concentrated drilling plan, especially when the actual results showed otherwise. Nor was there a credible basis to assume that the per-well oil and gas production from a pattern of three *sibling* wells would approximate per-well oil and gas production from a pattern with many *child* wells.

15.     Nevertheless, Alta Mesa's Directors and Officers decided that Alta Mesa should immediately commence a costly, full-scale development of multi-well patterns across its acreage. This decision was reckless and grossly negligent.

16.     As Tim J. Turner ("**Turner**"), Alta Mesa's Vice President of Corporate Development and Reserves, would later candidly explain, the 2018 Drilling Program was based not on a "high-confidence development plan," but rather on the "promised production" (in other words fanciful hopes) that Alta Mesa had made to its investors prior to the Business Combination. Because Alta Mesa had made promises to the market based on its limited and inconclusive pattern testing, it ramped up drilling to try to fulfill those lofty promises, ***even though the Directors and Officers were fully aware that they had <u>no actual or test pattern results</u> to support the 2018 Drilling Program***.

17.     At the time of the Business Combination, the only prudent course of action was, as Turner would later put it, to take "time to assess outcomes" and "define results" before implementing an unproven and massively costly drilling program. When the Directors and Officers approved the 2018 Drilling Program in February 2018, they knew (or were grossly negligent in not knowing) that if they simply waited a few months, then Alta Mesa would have critical production and EUR information from recently completed drilling patterns that, unlike the test patterns, actually approximated the types of wells Alta Mesa anticipated drilling. The results from these patterns, which included several high-density child patterns, would inform whether a large-scale drilling plan was economically viable. But the Directors and Officers, acting with reckless indifference, did not "take time to assess outcomes" and "define results." Put simply, they utterly neglected how to pursue a rational, fact-based, and data-driven drilling program that would have steadily developed Alta Mesa's oil and gas properties in a profitable and economically sustainable manner over time.

18.     After the Directors and Officers blindly approved the 2018 Drilling Program, Alta Mesa vastly ramped up its drilling, increased the number of rigs it was operating, and ultimately completed more than 170 new wells, the majority of which were new child wells. Because each new well cost close to $4 million to drill and complete, this drilling activity came at a considerable cost to the company.

19.     Because the Directors and Officers approved the 2018 Drilling Program before having evidence regarding the optimum number of wells to drill per section, Alta Mesa ultimately wasted hundreds of millions of dollars to drill and complete wells that were not economically viable. Moreover, by expending so much capital up front on an unsupported and seriously flawed drilling program, Alta Mesa's Directors and Officers needlessly created a liquidity crisis for the

company that prevented it from remaining in business. Along with the losses caused by drilling too many wells per section, the foolish ramp up in drilling activities in 2018 directly resulted in Alta Mesa's bankruptcy a year later.

20. Not only was the implementation of the 2018 Drilling Program grossly negligent and utterly reckless from the start, the Directors and Officers compounded Alta Mesa's losses by failing to curtail drilling operations, and thereby preserve capital, when faced with clear evidence that the 2018 Drilling Program was not working.

21. Alta Mesa's Officers—Harlan H. Chappelle ("**Chappelle**"), Alta Mesa's Chief Executive Officer, Michael E. Ellis ("**Ellis**"), Alta Mesa's Chief Operating Officer, and Turner— affirmatively knew by April 2018, if not earlier, that Alta Mesa's STACK acreage did not support high-density drilling because they understood that the more wells Alta Mesa drilled per section, the lower the average per-well EUR Alta Mesa obtained. These Officers also knew by April 2018 that Alta Mesa could not expect to drill child wells with an EUR above even 200 MBO, meaning that there was zero chance that newly completed wells would have, on average, an EUR of 250 MBO (the assumed per-well recovery on which the 2018 Drilling Program was based).

22. Despite having evidence that the assumptions underlying the 2018 Drilling Program were not just baseless but affirmatively wrong, the Officers failed to share this evidence with AMR's Board of Directors (the "**AMR Board**"). This lack of disclosure and candor is particularly egregious because Chappelle and Ellis also served as directors on the AMR Board.

23. Specifically, in March 2018, the Officers had information demonstrating that the child patterns completed in late 2017 and early 2018 were producing oil at a level below Alta Mesa's per-well "type curve"—which is a representation of the estimated cumulative production over time of a well with an EUR of 250 MBO. Chappelle and Turner recognized that actual results

from the patterns undercut the narrative they had previously spun regarding Alta Mesa's development potential, and thus the entire basis for the 2018 Drilling Program. They discussed whether they should "drop patterns" from a presentation Alta Mesa was preparing to investors and just "talk about new wells." Chappelle, however, knew that AMR's investors would want information on the patterns, which were the foundation for the 2018 Drilling Program. Turner found a solution to the disclosure problem.

24.     Turner created what he called a "'cleaned up' version" of the results from the patterns in which he *just deleted the lowest producing wells from each pattern*. Unsurprisingly, by removing the worst wells from the patterns, the average per-well production looked much better. Nonetheless, for some patterns, this flagrant data manipulation still failed to conceal the actual poor production volumes. Accordingly, Chappelle and Turner determined precisely when production volumes dropped below the type curve—*e.g.*, 60 days after initial production—and cut off the graphs after that point in their presentations to investors. Alta Mesa then presented this manipulated data to investors.  They, however, kept this information from the AMR Board.

25.     More data demonstrating the poor performance of the child wells, and thus the folly of the entire 2018 Drilling Program, came the following month. On April 16, 2018, Turner emailed Ellis and others a chart containing the EUR per well for various child patterns, including recent ones that had begun producing in late 2017 and early 2018. This chart depicted an inverse relationship between the number of wells drilled per section and the EUR per well. The evidence in April 2018 also showed that the average EUR per well for the child patterns was *only 183 MBO*, materially below the EUR of 250 MBO per well on which the 2018 Drilling Program was based. And because this average included the EUR of the parent wells in the patterns, the newly completed child wells had an even lower average EUR.

26. Nevertheless, none of this material information concerning the performance of Alta Mesa's recently completed patterns was conveyed to the AMR Board so that it could stop the 2018 Drilling Program and replace it with a more sensible one. Instead of acting in good faith to protect Alta Mesa, in May 2018, Chappelle, Ellis, and Turner misrepresented to investors, in a presentation filed with the Securities and Exchange Commission ("**SEC**") that contained the manipulated data: "Multi-well development patterns across field *are favorable*." They knowingly made this misrepresentation despite the fact that the real, complete data was unequivocally *not favorable*.

27. Around the same time, desperate to produce the "promised production" of their 2018 Drilling Program, Chappelle and Ellis began to rapidly install very expensive and unproven electrical submersible pumps ("**ESPs**") across Alta Mesa's STACK acreage, eventually installing over 80 ESPs. Each ESP cost $250,000 to install and another $5,000 to $6,000 per month to operate. Prior to this massive roll-out, Alta Mesa had installed ESPs on only two "unusual" wells. Based on this paper-thin evidence, Chappelle and Ellis gambled big on ESPs, sinking tens of millions of dollars installing them across dozens of wells. The gamble did not pay off. The ESPs did not increase the EUR of most wells on which they were installed, were plagued by costly mechanical problems, and were the drilling equivalent of flushing money down the drain.

28. Further evidence of the poor performance of Alta Mesa's newly completed wells continued to pour in throughout the summer and fall of 2018. In fact, by the summer of 2018, Alta Mesa's Officers internally recognized the "cold reality" that the average EUR of child wells was around *only 150 MBO*—60% of the assumed EUR unreasonably built into the drilling plan. And in October 2018, Chappelle and Turner privately discussed the "sobering" data demonstrating that the more wells per section Alta Mesa drilled, the less oil the company could expect to produce per well.

29.     Unfortunately for Alta Mesa and its creditors, this sobering data was not timely conveyed to the AMR Board; and the AMR Board, for its part, also completely disregarded its duty to monitor the 2018 Drilling Program (after recklessly approving it in February 2018). Finally, in September of 2018, the AMR Board started to learn about the massive problems with the costly 2018 Drilling Program they had blindly approved and failed to monitor. But it was not until December 2018—many months after they knew or should have known about the results from the new wells—that the Directors decided to stop the wasteful expenditures.

30.     During a December 2018 board meeting, the AMR Board decided it had lost confidence in Chappelle and Ellis and asked them to resign, which Chappelle and Ellis did rather than be fired. Alta Mesa retained new management and immediately started decreasing its drilling activity to reduce cost. In fact, by February 2019, Alta Mesa's new management ceased operating rigs altogether to figure out how to develop a prudent and economical drilling program—the exact thing the Officers should have done, and the Directors should have demanded, a year earlier when it was obvious that more pattern testing was necessary. But by 2019, the effort to develop a cost-effective and profitable approach to drilling wells was too little, too late.

31.     Alta Mesa filed for bankruptcy in September 2019. After being valued at more than $2.25 billion as of the Business Combination, its assets were sold in 2020 at liquidation prices for less than $200 million. Not only did Alta Mesa's investors lose over one billion dollars, but Alta Mesa's creditors, the principal beneficiaries of the Trust, were left holding the proverbial bag. Due to the damages sustained by Alta Mesa, including from its resulting bankruptcy, creditors with more than $600 million in claims have been left with unpaid debts.

32.     In sum, as a direct and proximate result of the Directors' and Officers' respective breaches of fiduciary duties, including the bad-faith conduct of Chappelle, Ellis, and Turner, Alta

Mesa wasted hundreds of millions of dollars drilling unnecessary and uneconomic wells in 2018. The Directors and Officers then compounded these losses by recklessly causing Alta Mesa to burn through its capital, which it did by, among other things, operating eight drilling rigs in 2018 when there was no basis for the company to ramp up drilling activities. Because of the massively wasteful and imprudent expenditures in 2018, Alta Mesa lacked the capital and liquidity to continue operating its business. Rather than continue as a going concern and profitable enterprise, Alta Mesa was forced to file for bankruptcy in 2019 and sell its assets at liquidation prices in 2020.

33.     The Trustee, on behalf of the Trust, the successor-in-interest to the causes of action of Alta Mesa asserted herein, brings this action to recover the hundreds of millions of dollars in damages sustained by Alta Mesa after the Business Combination in February 2018.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over this case under 28 U.S.C. § 1332(b) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

35.     David Dunn ("**Dunn**"), the Trustee of the Trust, is a citizen of Connecticut.

36.     Defendants are citizens of Texas, New York, and Montana. No defendant is a citizen of Connecticut.

37.     This Court also has jurisdiction over this case pursuant to 28 U.S.C. §§ 157(a) and 1334(b), in that the Complaint asserts causes of action arising in, arising under, and/or relating to the above-captioned bankruptcy case.

38.      Venue is proper in this District because Defendants reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District. Further, venue is proper in this District because Alta Mesa's bankruptcy case is pending in this District.

39. Pursuant to Federal Rule of Bankruptcy Procedure 7008, the Trust states that it hereby consents to the Bankruptcy Court's entry of final orders and judgment in this adversary proceeding.

## PARTIES AND RELATED ENTITIES

40. The Trust was created in connection with the confirmed Chapter 11 plan for Alta Mesa Resources, Inc. and its Alta Mesa Holdings and Silver Run debtor affiliates[3] (the "**Bankruptcy Plan**"). Dunn was appointed trustee of the Trust.

41. Although certain directors and officers of Alta Mesa and AMR received releases as part of the Bankruptcy Plan, Alta Mesa did not release its claim against the defendants in this action. Alta Mesa's claims against the Directors and Officers were assigned to the Trust as part of the Bankruptcy Plan.[4]

42. During all relevant times, Alta Mesa's general partner was Alta Mesa Holdings, GP LLC ("**Alta Mesa GP**"), and all of Alta Mesa's limited partnership interests were owned by SRII Opco, LP ("**SRII Opco**"). SRII Opco controlled Alta Mesa GP. The general partner of SRII Opco was SRII Opco GP, LLC, which was owned and controlled by AMR. Accordingly, the Directors and Officers of AMR owed a fiduciary duty to Alta Mesa as the human controllers of Alta Mesa.

43. As further described herein, most of the relevant actions taken on behalf of Alta Mesa, including the approval of the 2018 Drilling Program as part of AMR's operating budget, were directed by AMR, as the controller of Alta Mesa, by its Directors and Officers.

---

[3] The debtors in these chapter 11 cases are as follows: Alta Mesa Resources, Inc.; Alta Mesa Holdings, LP; Alta Mesa Holdings GP, LLC; OEM GP, LLC; Alta Mesa Finance Services Corp.; Alta Mesa Services, LP; Oklahoma Energy Acquisitions, LP; SRII Opco GP, LLC; SRII Opco, LP; Kingfisher Midstream, LLC; Kingfisher STACK Oil Pipeline, LLC; Oklahoma Produced Water Solutions, LLC; and Cimarron Express Pipeline, LLC.

13

44. Defendant Harlan H. Chappelle was the Chief Executive Officer ("**CEO**") of Alta Mesa and the CEO, President, and a Director/Manager of Alta Mesa GP from around 2005 until his resignation effective December 26, 2018. Chappelle also was the CEO of AMR and served on AMR's Board of Directors from the closing of the Business Combination on February 9, 2018 until his resignation.

45. Defendant Donald Dimitrievich served on AMR's Board of Directors from the closing of the Business Combination on February 9, 2018 until AMR filed for bankruptcy.

46. Defendant Michael E. Ellis was the Chief Operating Officer ("**COO**") of Alta Mesa and a Director/Manager of Alta Mesa GP from around 1990 until his resignation effective December 26, 2018. Ellis also served on AMR's Board of Directors from the closing of the Business Combination on February 9, 2018 until his resignation. Ellis also was the COO of Alta Mesa GP from at least the closing of the Business Combination until his resignation.

47. Defendant James T. Hackett was Executive Chairman of AMR's Board of Directors from the closing of the Business Combination on February 9, 2018 until AMR filed for bankruptcy. Hackett also served as a Director/Manager of Alta Mesa GP from the closing of the Business Combination until Alta Mesa's bankruptcy. In addition, Hackett served as Interim CEO of Alta Mesa GP from Chappelle's resignation on December 26, 2018 until September 11, 2019.

48. Defendant Pierre F. Lapeyre, Jr. was a Director of AMR from the closing of the Business Combination on February 9, 2018 until AMR filed for bankruptcy.

49. Defendant David M. Leuschen was a Director of AMR from the closing of the Business Combination on February 9, 2018 until AMR filed for bankruptcy.

14

50.     Defendant Tim J. Turner was the Vice President of Corporate Development and Reserves at Alta Mesa from 2013 until April 2020. Turner also, at the very least, was a de facto officer of Alta Mesa GP from at least the closing of the Business Combination until April 2020.

51.     As used herein, the "**Directors**" are Hackett, Lapeyre, Leuschen, Dimitrievich, Chappelle, and Ellis. And, as used herein, the "**Officers**" are Chappelle in his capacity as the CEO, Ellis in his capacity as COO, and Turner.

## FACTUAL BACKGROUND

A.     **Prior to the Bankruptcy Combination, Alta Mesa Had Results from a Very Limited Number of Well Pattern Tests**

1.     **Oil and gas reserves and the economics of drilling wells.**

52.     Oil and gas assets represent the majority of the value of an upstream oil and gas company like Alta Mesa. A company's oil and gas reserves refer to the amount of oil and gas that the company can technically recover at a cost that is financially feasible.

53.     There are two principal classifications of reserves: proven (or proved) and unproven (or unproved). Proven reserves are those reserves claimed to have a reasonable certainty (normally at least 90% confidence) of being recoverable under existing economic and technological conditions. Proven reserves are further subdivided into proven developed and proven undeveloped. Proven developed reserves, as a general matter, are reserves that can be produced with existing wells. Proven undeveloped reserves, conversely, require additional capital investment—*i.e.*, the cost to drill and complete wells to extract the oil and gas.

54.     Unproven reserves are calculated based on geological data similar to that used in estimates of proven reserves but are considered "unproven" because of technical, contractual, or regulatory uncertainties. Unproven reserves can be further divided into two subcategories— "probable" (between 50% and 90% likelihood of being recoverable) and "possible" (between 10%

and 50% likelihood of being recoverable)—to indicate the relative degree of uncertainty about their recoverability.

55.     Determining the optimal number of wells to drill is a crucial component of oil field development. There is a finite amount of recoverable oil and gas in a reservoir. Generally, more wells will produce oil and gas faster, increasing value. Conversely, each well is very costly to drill, and drilling too many wells close together can decrease each well's productivity (explained further below). Thus, to develop a profitable and sustainable drilling program, it is imperative for upstream oil and gas companies to determine the optimal number of wells to drill per drilling spacing unit, or "section," to maximize value.

56.     On a high-level, in a particular section, a certain minimum number of wells is required to extract the recoverable oil and gas from that area of the field. While adding more wells to a section will likely increase the near-term production of hydrocarbons, drilling more wells will also decrease the average EUR per well in that section. This is because close spacing between wells will cause some of the hydrocarbon-bearing sands to be penetrated by more than one well, which, in turn, leads to interference (or communication) between the wells. In other words, wells drilled too close together draw oil and gas from the same finite source, dividing it up. Interference between wells lowers the average production volume per well.

57.     The number of wells drilled in a section and their respective average EUR directly affects the economics of the development of the reservoir. The net present value, or "**NPV**," of a company's earning power may be improved if additional wells are drilled because more wells will likely shorten the production life of the reservoir—*i.e.*, reduce the years required to extract the recoverable oil and gas—meaning that revenue is earned sooner. But because each additional well

in a section costs money to drill and complete, this added upfront cost must be factored into the NPV analysis.

58.     In short, the goal for most upstream companies, such as Alta Mesa, is to determine the optimal number of wells to maximize the NPV of the development. To arrive at a reasonable estimate of the optimal number of wells per section, companies consider a variety of a factors, from geological studies to the results from previously completed multi-well spacing tests.

59.     After a company determines the optimal number of wells to drill, there are still other economic considerations. In particular, that company must ensure that it has the capital to sustain current operations, as well as to continue exploration and development. Due to the upfront cost of drilling and completing wells, if a company spends too much capital during a year adding wells, it may not have the cash flow and resources to continue operating in the following years. Generally, production of oil and gas from existing wells declines over time, meaning that an oil and gas production company must constantly maintain a drilling regime to sustain its current levels of production. Because oil and gas production, unlike many industries, requires continuous capital expenditures to maintain—let alone increase—revenue streams, disruptions in capital expenditures due to liquidity constraints often prove fatal for upstream oil and gas businesses.

60.     One major capital expenditure is the operation of drilling rigs. Increasing the number of rigs in simultaneous operation allows companies to increase the number of wells they drill and complete in a year. But each additional rig in operation increases capital expenditures.

61.     The prices of oil and gas are also important variables in any NPV analysis. Although no company has a crystal ball, planning for a possible dip in the price of oil and gas is important for any upstream oil and gas company. But this planning becomes crucial when developing an aggressive drilling plan, because any swing in price can have a much larger impact

17

on a company that has just invested much of its capital on drilling new wells. The more wells a company drills, the smaller the margin for error if there is an unexpected decline in oil prices.

62.     In this case, Alta Mesa neither optimized the NPV of its oil and gas resources nor prudently ran its drilling program to ensure that the company retained sufficient capital to continue operating and developing its oil and gas acreage over time.[5] In fact, it commenced the program without evidentiary support and then ignored the actual results when they demonstrated the folly of the entire program.

### 2.     Alta Mesa drilled a few multi-well test patterns, but the results were inconclusive at best.

63.     Prior to the Business Combination, most of Alta Mesa's wells were not part of a well pattern in which multiple wells are completed within a section of the reservoir. Instead, most of Alta Mesa's wells were single wells, *i.e.*, one well per section.

64.     In 2014, Alta Mesa began drilling multi-well test patterns of two types: child patterns and sibling patterns. A child pattern consists of one existing producing well, or "parent," and several smaller "child" (or "infill") wells drilled later in time and in close proximity to the parent. A sibling pattern consists of multiple new parent wells drilled simultaneously.

65.     Between 2014 and early 2017, Alta Mesa completed seven initial multi-well test patterns, six of which had started producing oil by the summer of 2017. And the seventh pattern started producing oil from three of its four wells in September 2017. These seven patterns, set forth below, involved various configurations, from the number of wells per section, to the spacing between the wells, to whether they were child or sibling patterns.

---

[5] Because the majority of Alta Mesa's actual and estimated revenue came from oil rather than gas, the allegations in this complaint focus on Alta Mesa's production of oil from the STACK.

| Pattern Name | Type | Number of Wells | Average Spacing | First Production From All Wells |
|---|---|---|---|---|
| LNU | Child | 5 (2 parents, 3 children) | 640' | 3/1/2015 |
| Borelli-Dodd | Sibling | 3 siblings | 750' | 7/9/2015 |
| Bullis-Coleman | Child | 10 (2 parents, 8 children) | 490' | 4/4/2017 |
| Oswald | Sibling | 3 siblings | 750' | 10/6/2015 |
| EHU South | Sibling | 4 siblings | 750' | 4/12/2016 |
| EHU North[6] | Sibling | 3 siblings | 330' | 9/14/2017 |
| Huntsman | Sibling | 4 siblings | 620' | 6/17/2017 |

66.    As of December 2017, only two test patterns produced oil in line with Alta Mesa's type curve and had an average EUR per well of around 250 MBO: the Oswald and Borelli-Dodd patterns, both of which were sibling patterns. Furthermore, these patterns had only three wells— two wells in one "bench" of the formation and one well in another bench. (A "bench" is a hydrocarbon producing geological layer in the formation. The depth of a well determines which bench or layer in the formation it is in.) With only three wells, there was less potential for inter-well interference. Consequently, the results of the Oswald and Borelli-Dodd patterns were not readily transferrable to drilling patterns with more wells per section, even if the horizontal spacing between wells in a bench remained roughly the same.

67.    As of December 2017, the average EUR of each of the two child patterns—the LNU and Bullis-Coleman patterns—was far below the EUR of 250 MBO that Alta Mesa believed an average well would produce. Specifically, the average per-well EUR for the LNU pattern was *only 78 MBO*, and the average per-well EUR for the Bullis-Coleman pattern was *only 64 MBO*. Perhaps more importantly, the average EUR of the *child* wells in those patterns was even lower, because the older parent wells in the pattern had relatively higher EUR.

---

[6] There was a fourth well in the EHU North pattern, but it did not start producing oil until July 2018. Accordingly, the pattern here is listed as having three wells.

68.     The average EUR of each of the wells in the remaining test sibling patterns—EHU South, EHU North, and the Huntsman pattern—was also well below 250 MBO.

69.     As described further below, Alta Mesa touted its first seven multi-well test patterns as evidence of its ability to drill up to twelve wells per section while still achieving an EUR of 250 MBO per well. Furthermore, allegedly based on the results from these first patterns, Alta Mesa started drilling more multi-well patterns in late 2017, which it referred to as "development patterns," to contrast them from the prior seven test patterns.

**B.     Alta Mesa Received a Cash Influx from a "Blank Check" Company.**

**1.     Silver Run hastily selects Alta Mesa as its acquisition target.**

70.     Riverstone Holdings LLC ("**Riverstone**"), a private equity firm, formed Silver Run in 2016 as a special purpose acquisition company ("**SPAC**"), or "blank check" company. SPACs are publicly traded companies created for the purpose of raising funds to effect an acquisition or other business combination. Silver Run would raise capital by completing an IPO and use that capital to effect an acquisition of an as-yet unidentified target in the energy sector.

71.     On or about March 24, 2017, Silver Run completed its IPO, sponsored by Riverstone. Silver Run sold 103.5 million shares of common units to investors for gross proceeds of $1.035 billion, as well as a private placement of 15,133,33 warrants to Riverstone. Ninety percent of the funds raised were put in a trust to fund a future business combination, as required by the law governing SPACs.

72.     Shortly after its IPO, Silver Run identified Alta Mesa and Kingfisher as potential acquisition targets. Kingfisher was a midstream company focused on providing crude oil gathering, gas gathering, and processing and marketing to upstream oil and gas companies in the STACK. Prior to the Business Combination, Kingfisher had overlapping owners with Alta Mesa, and almost all of Kingfisher's revenues were derived from its contracts with Alta Mesa.

73.     By early May 2017, Silver Run and Alta Mesa had entered into a nondisclosure agreement. On August 16, 2017, Silver Run announced its intention to merge with Alta Mesa and Kingfisher and valued the transaction at $3.8 billion.

**2.     The Officers knew that the results from the pattern tests did not support Alta Mesa's plan to drill six to twelve wells per section.**

74.     By August 2017, the Officers knew that results from Alta Mesa's child pattern tests had yielded disappointing results. Specifically, the Officers were aware that none of the child wells in these patterns would have an EUR of 250 MBO, or anywhere close to such an EUR.

75.     Chappelle and Ellis further recognized as early as June 2017 that there was a difference between testing three wells in a section, on the one hand, and six or more wells in a section, on the other hand.

76.     Turner told Chappelle in June 2017 that there "could be an argument" that the reason why the Borelli-Dodd and Oswald sibling patterns (two of the seven test patterns) had a higher EUR than the other pattern tests was because they only had three wells per section. Chappelle agreed with this assessment.

77.     The Officers further knew that drilling more wells in a section could result in well interference, lowering the production from certain wells in the section. Such concerns arose in connection with the Huntsman test pattern. By the fourth quarter of 2017, the Huntsman pattern, like the Bullis-Coleman pattern, was dramatically underperforming the type curve. In fact, the EUR of the Huntsman pattern was only around 150 MBO.

78.     Alta Mesa's Officers discussed the reasons why they believed the Huntsman pattern was a poor performer. The Huntsman pattern had suffered from inter-well interference—multiple wells drilled in the same bench were drawing oil from the same source and sharing its production, resulting in a lower average EUR per well.

79.     On November 1, 2017, Gene Cole ("**Cole**"), Alta Mesa's Vice President and Chief Technology Officer, emailed Ellis, Turner, and others: "So the west half of the huntsmen [sic] has 4 wells for 585mbo." Turner responded on November 2, 2017, with an Excel spreadsheet revealing that one of the Osage[7] bench wells in the Huntsman pattern had an ***EUR of only 60 MBO***, and another Osage bench well had an ***EUR of only 40 MBO***.

80.     Ellis, Cole, and Turner then discussed why those two wells likely had such poor production levels. Cole stated on November 2, 2017: "We know part of the reason the upper landings are producing more oil in the [H]untsman is because ***they are taking oil from the Osage***." Turner replied on November 3, 2017: "It seems ***there is also some connectivity between the Osage and Meramec*** that is natural and/or hydraulically induced."

81.     A little more than a week later, Chappelle, Turner, and Kevin Bourque ("**Bourque**"), Alta Mesa's VP of Drilling and Administration, discussed a graph showing the Huntsman pattern. During this discussion, Chappelle and Turner again discussed the difference between the performance of the wells in the benches.

82.     Ellis and Turner suspected that the benches in the STACK might ***not*** be distinct— *i.e.*, that drilling in one bench could reduce the recoverability of oil in a bench above or below that bench. But because they knew that Alta Mesa's anticipated drilling plan, as well as its reserve estimates, were based on the notion of distinct benches in Alta Mesa's STACK acreage, the Officers did not reveal their concerns to the AMR Board when it met to approve the 2018 Drilling Program. As described further below, it was not until more than a year later that the Officers

---

[7] The STACK play has two primary benches, or reservoir formations: the Osage and the Meramec. They are vertically adjacent, or "stacked" one on top of the other. (Such stacking of formations is part of why this region was named the STACK.) The Osage and Meramec benches differ in characteristics such as thickness, type of stone, clay volume, and porosity.

conceded the connectivity between benches—something they at least suspected was a risk back in 2017.

83.     In sum, the Officers knew that the only thing Alta Mesa's test patterns showed was that Alta Mesa *might* be able to meet its published type curve by drilling three sibling wells in a section. The Officers knew they had no evidence directly supporting their long-term development plans, which required Alta Mesa to drill dense patterns of child wells, *not* sibling wells, with up to twelve wells per section, *not* merely three wells per section.

84.     Recognizing that results from the initial seven test patterns did not support future drilling and development plans, the Officers admitted to the need for further pattern testing. For instance, Chappelle told Ellis in June 2017 that the Hoskins child pattern, which Alta Mesa had started to drill and would finish in late 2017, would be a "***very important test***" because it would be an ***eight-well child pattern***, as opposed to a three-well sibling pattern like the Borelli-Dodd and Oswald patterns.

85.     Of course, as explained further below, when the AMR Board convened in February 2018, neither Chappelle, Ellis, nor Turner told the AMR Board to await the results from the recently completed high-density child patterns—despite their recognition just a few months earlier that these patterns would be "very important tests" to gauge the reasonableness of the assumptions underlying the costly 2018 Drilling Program. And the Directors completely failed to inform themselves about Alta Mesa's need for further testing of the company's proposed well patterns.

**3.     The Business Combination closed on February 9, 2018, and Alta Mesa received approximately $500 million in cash for operations.**

86.     On January 19, 2018, Silver Run issued the definitive Proxy to its shareholders on Schedule 14A in connection with the efforts by it and Alta Mesa to secure shareholder support for

the Business Combination. Ninety-eight percent of Silver Run's shareholders voted to approve the transaction on February 6, 2018, and the Business Combination closed on February 9, 2018.

87.     To complete the Business Combination, Alta Mesa's and Kingfisher's former owners received equity in the new AMR enterprise, with Kingfisher's former owners also receiving around $800 million in cash. Alta Mesa also received around $700 million in cash to pay off certain debts and fund its operations, including the 2018 Drilling Program, as set forth below.

C.     **The Directors Recklessly Approved the 2018 Drilling Program.**

1.     **Overview of the 2018 Drilling Program.**

88.     The 2018 Drilling Program was based on the notion that Alta Mesa had more than 4,000 gross drilling locations, could drill up to 12 wells per section, and could recover 250 MBO from each well in the section. That is, Alta Mesa assumed that even multi-well patterns of six or more wells per section would produce oil, on average, in line with the type curve for a well with an EUR of 250 MBO. The linear extrapolation of a per-well EUR for one well per section to 12 wells per section was unsupported by any data.

89.     For 2018, Alta Mesa planned to drill approximately 200 wells, almost double the number of wells it drilled in 2017. Unlike in 2017 and previous years, more than 75% of new wells would be part of multi-well pattern developments. Further, because a significant portion of Alta Mesa's acreage already had parent wells, the majority of the new wells in 2018 would be child wells. By comparison, Alta Mesa drilled zero child wells in 2016 and 30 child wells in 2017 (22 of which started producing in the fourth quarter of 2017).

90.     Another important component of the 2018 Drilling Program was the ramp up in the number of operating rigs, the operation of which is one of the primary costs associated with drilling wells. In 2017, Alta Mesa deployed four to six drilling rigs, with the increase in rigs coming in the

latter part of the year. Alta Mesa planned to steadily increase the number of rigs to ten by the end of 2018, resulting in an average of eight rigs in operation throughout the year.

## 2. The Board of Directors, shirking their fiduciary duties to Alta Mesa, blindly approved the massive budget for the 2018 Drilling Program.

91.     After the Business Combination closed, Silver Run and Riverstone installed their own directors at AMR—Hackett, Leuschen, and Lapeyre. Chappelle and Ellis also became directors of AMR following the Business Combination. As a result of these additions, the AMR Board consisted of eleven directors.[8] Hackett was also appointed as a Manager of Alta Mesa GP, where he served alongside Chappelle and Ellis.

92.     On February 12, 2018, the AMR Board met to approve Alta Mesa's 2018 Drilling Program, including the massive capital expenditures it required.[9]  The AMR Board understood the tremendous cost associated with the aggressive 2018 Drilling Program and the considerable risks to Alta Mesa should it fall short of its production projections. Nonetheless, little to no information was provided to the AMR Board regarding the basis for the 2018 Drilling Program. In fact, there was no drilling results to support it.

93.     There is no evidence that the AMR Board considered whether the results from the well pattern tests supported the aggressive 2018 Drilling Program. At the very least, the AMR Board failed to consider, in an informed and reasonable manner, the assumptions underlying the 2018 Drilling Program.

---

[8] The eleven directors immediately after the Business Combination were Hackett, Leuschen, Lapeyre, Chappelle, Ellis, Dimitrievich, William W. McMullen, Jeffrey H. Tepper, Diana J. Walters, Donald R. Sinclair, and William D. Gutermuth. On June 18, 2018, Sylvia Kerrigan was became the twelfth director. Those directors not named in this action received releases as part of Alta Mesa's Confirmed Plan.

[9] Turner was not a director, but he attended the February 2018 board meeting. According to the minutes, Turner attended the meeting as the company's Vice President of Corporate Development. Turner knew that the 2018 Drilling Program was not based on reasonable assumptions, but supported the program nonetheless.

94.     Had the AMR Board, including the defendant Directors, reviewed the assumptions underlying the 2018 Drilling Program, it would have been obvious that the actual data did not support the 2018 Drilling Program.

95.     *First*, as of February 2018, the Directors knew that Alta Mesa had no prior well data demonstrating that Alta Mesa could drill four or more wells per section without compromising per-well performance and EUR. In fact, the only data available to Alta Mesa showed that when Alta Mesa increased well density beyond three wells per section, per-well EUR declined.

96.     *Second*, as of February 2018, the Directors knew that Alta Mesa had no prior well data demonstrating that Alta Mesa could drill patterns with child wells without compromising per-well performance and EUR. In fact, the only data available to Alta Mesa showed that Alta Mesa's child wells failed to produce oil at rates even close to their parent wells.

97.     *Third,* the Directors knew that there were reports from the industry of "lesser than anticipated type curves for the child wells." The Directors knew that this industry data was in-line with the evidence that Alta Mesa had seen on its own reservoir from its test patterns.

98.     *Fourth*, as described above, Chappelle, Ellis, and Hackett knew that, in Chappelle's words, more testing would be "very important" to determine the viability of the go-forward drilling plan. Hackett even testified during Alta Mesa's bankruptcy proceeding that the results from the prior well patterns "***were <u>indeterminate</u> because we hadn't actually felt that we had executed on those properly***."

99.     Nevertheless, despite the lack of historical evidence supporting the 2018 Drilling Program *and* the express recognition of the critical need for more testing—particularly with respect to the issue of well density—the Directors eschewed further testing of well patterns to determine the optimum density of wells per section. Instead, they approved a costly and aggressive

development program based on the completely unsupported notion that Alta Mesa could drill four or more wells per section without compromising per-well EUR.

100.     Specifically, the AMR Board, including the defendant Directors, approved a $566 million capital expenditure budget (the "**2018 Capex Budget**") for Alta Mesa.[10] The 2018 Capex Budget assumed that Alta Mesa would spend approximately $3.5 million to drill and complete each well and that Alta Mesa would drill around 200 wells in 2018. As set forth in the minutes from the February 12, 2018 board meeting, the AMR Board, acting as Alta Mesa's controlling parent, specifically approved spending more than half a billion dollars in Alta Mesa's cash on the 2018 Drilling Program.

101.     In sum, the Directors either knew there was no reasonable basis for the 2018 Drilling Program and its associated capital expenditures, or they utterly failed to inform themselves regarding the core of Alta Mesa's business—its ability to produce oil and gas in a cost-effective and profitable manner. Either way, the Directors' decision to approve the 2018 Drilling Program as part of Alta Mesa's 2018 capital budget was grossly negligent.

**3.     Had the Directors and Officers exercised due care, they would have awaited the results from recently completed child patterns before ramping up drilling.**

102.     As set forth above, the initial test patterns did not support Alta Mesa's 2018 Drilling Program. In fact, the evidence from these test patterns showed that drilling more wells reduced the average EUR per well. Further, the child patterns that Alta Mesa tested in 2017 were not successful and had poor results. Accordingly, as the Directors knew, *Alta Mesa had no results from well patterns evidencing that child patterns with four to ten wells per section would achieve production in line with the 250 MBO type curve.*

---

[10] As set forth in the meeting minutes, Chappelle attended the meeting as a Director and as the company's CEO, and Ellis attended the meeting as a Director and as the company's COO.

103.    The Directors knew, or must have known, that Alta Mesa had also completed drilling eleven new multi-well patterns by February 1, 2018, which they called "development patterns." Importantly, six of these new patterns were producing oil by February 1, 2018:

| Pattern Name | Type | Number of Wells | Average Well Spacing | First Production from All Wells |
|---|---|---|---|---|
| Ash-Foster | Child | 10 | 636' | 12/22/2017 |
| Hoskins | Child | 8 | 645' | 12/24/2017 |
| Themer | Child | 8 | 650' | 1/10/2018 |
| Todd | Child | 4 | 795' | 2/1/2018 |
| Lankard | Child | 3 | 674' | 1/20/2018 |
| Paris | Child | 6 | 604' | 1/7/2018 |

104.    Alta Mesa's Directors and Officers knew that it required at least 90 days to begin to understand the production profile of a given well. They also knew that Alta Mesa would have had 90 days of production data from all but the Todd pattern by the end of April 2018.

105.    Due to the substantial losses that Alta Mesa would suffer if its drilling plan decreased the average per-well EUR (by, among other things, causing interference between wells in a section), the only reasonable course of action was to control cost—and not ramp up drilling—until results from the recently drilled patterns came in. Moreover, leaving aside the issue of well density, if child wells were going to have a lower EUR regardless of well spacing, the prudent course of action was to identify that EUR and develop a Drilling Program based on it, rather than on the unsubstantiated belief that new child wells would produce like previously drilled parent wells. Instead of taking the prudent course of action, the Directors and Officers acted with reckless disregard to the known risk of spending hundreds of millions of dollars, over the course of just one year, on an untested and highly aggressive drilling program.

106.    The failure of the Directors and Officers to wait until they could evaluate results from the new patterns before embarking on the costly 2018 Drilling Program proved fatal for Alta Mesa. As explained further below, had the Directors and Officers waited for the results from the

recent development patterns *before* approving a rapid increase in drilling activities—as Chappelle and others even recognized they should—they would have had sufficient data by April 2018 to realize that the premise of the 2018 Drilling Program was seriously flawed.

107.    The Directors and Officers continued to consciously disregard their fiduciary duties after recklessly approving the 2018 Drilling Program. More specifically, had they acted prudently and kept themselves informed about the results from the development patterns, the AMR Board would have understood by April 2018 that Alta Mesa needed to reduce the number of wells it was drilling per section and curtail capital expenditures by, among other things, reducing rig operations.

**D.    After Recklessly Approving the 2018 Drilling Program, the Directors and Officers Failed to Prevent Further Wasteful Capital Expenditures.**

**1.    By April 2018, Chappelle and Ellis knew that the Patterns were materially underperforming.**

108.    By April 2018, Alta Mesa had more than sufficient information to immediately reevaluate the 2018 Drilling Program. Alta Mesa's Officers, including Chappelle and Ellis in their capacities as officers and directors, however, failed to convey this information to the AMR Board. And the non-officer Directors, for their part, consciously disregarded their duty to keep themselves informed of the most critical issues facing Alta Mesa's business, thereby compounding the problems associated with the Officers' non-disclosure.

109.    Turner and Chappelle realized in March 2018 that there were problems with the recent child development patterns. For instance, in March 2018, Chappelle, Turner, and Bourque reviewed documents showing the cumulative oil production from the patterns completed in late 2017 and early 2018. The results were not good. The data showed that the Ash-Foster pattern—even including the higher production from its two parent wells—had fallen below the type curve after around 70 days:



110.    The data showed that the Hoskins pattern, even including production from the parent well, had also fallen below the type curve by around 70 days:



111.    And if the production boost from the parent well was removed, then the child wells in the Hoskins pattern had, on average, ***fallen below the type curve by around just 40 days***, as set forth in the following chart:



112.    Likewise, the Paris pattern also was below the type curve by 70 days:



31

113.     Instead of presenting this information to the public and to the AMR Board, Turner and Chappelle sought a way to omit the poor results. They developed a two-prong solution to the problem.

114.     First, Turner created a new data file, which he called the "'cleaned up' version," that removed, in his words, "low days." In reality, what Turner did was completely remove the lowest producing wells from a pattern and then re-calculate the pattern average without those wells. By removing the poorest producing wells, Turner was able to substantially increase the purported cumulative production from the patterns. Second, when removing certain wells was not sufficient to tell the story they wanted to tell, Turner and Chappelle just omitted the part of the charts after the point in time when the pattern's production fell below the type curve.

115.     Turner and Chappelle discussed whether to show this materially misleading and false data on the patterns. Turner said the other option was to "[m]aybe drop patterns and talk about new wells." Chappelle, however, responded: "Well patterns are 75% of what we will do this year so we have to talk about them." Recognizing that they had to present data on the patterns, Chappelle and Turner decided to present the manipulated and incomplete data rather than reveal the truth.

116.     On or around March 29, 2019, Alta Mesa published a presentation on "Q4 2017 Earnings" and "2018 Operational Update and Guidance." The presentation contained the following slide (with the ovals added to show the graphs being cut short):



117. The slide shows the Ash-Foster, Themer, Hoskins, and Paris patterns all above the type curve, *i.e.*, the "250 MBO TC," on the graphs. But, as mentioned above, for the Ash-Foster, Hoskins, and Paris patterns, this was achieved by removing the lower production days from the data. The following is an excerpt from the Excel file that Turner used to create the misleading data regarding the Ash-Foster pattern:



118.    This Excel file, titled "Type Well v. New Miss Wells v3 REMOVE LWR LOW RATE," shows the removal of data from two of the wells (Ash 1705 4B 19MH and Ash 1705 5B 19MH). This data was deleted because, as shown from the original file (excerpted below), these two wells were barely producing oil.



119.    In addition, although Alta Mesa had more than 60 days of production data from the Hoskins and Paris patterns, Chappelle and Turner simply removed this data. The graphs are visibly cut short to hide the poor results after the first 40 to 50 days of production.

120.    Furthermore, on March 22, 2018, Chappelle circulated to Ellis and others a report on STACK spacing, titled "STACK Meramec Spacing: Co-Completed Wells Shine, Child Wells Decline." One of the key points noted in this report was that ***"[t]ighter spacing increases deterioration in the rates of child wells*** compared to the average parent well for a given operator, region and vintage." The report's conclusion about the deterioration in the production from child wells was not news to either Chappelle or Ellis. They had previously discussed industry data indicating the deterioration in child well EUR.

121.    In fact, as early as July 2017, Hackett had asked Chappelle and Turner about child wells because some of Alta Mesa's competitors in the STACK had announced that their child wells had been underperforming their type curves. Turner admitted that Alta Mesa's two child test patterns (Bullis-Coleman and LNU) had indeed performed "off trend," but he dismissed these concerns because the parent wells in these patterns had not been pressured (pumped with water) prior to drilling the child wells. Now, in March 2018, it was clear that pressuring the parent well did not materially increase the performance of the child wells.

122.    Cognizant of the deterioration in the production from child wells in comparison to their parent wells, on April 7, 2018, Chappelle emailed Turner and Bourque to discuss the child wells. Bourque responded on the same day:

> My first thought: I think most of our offset operators are going to be saying that they're seeing 70-90% of the parents when drilling infills [child wells] from the informal conservations I've had.
>
> ***I don't believe most expect our infill to be 100% of the original single wells in a section***.

Turner then added: "***Mike [Ellis] called it 80% or 200mbo***."

123.    Accordingly, by early April 2018, Chappelle, Ellis, and Turner all agreed that Alta Mesa's child wells—which were the centerpiece of the 2018 Drilling Program approved two

months earlier—would have at least a 20% lower EUR that their parent wells. The 2018 Drilling Program, to reiterate, was based on the notion that each well in a pattern would have, on average, an EUR of 250 MBO. By recognizing that the actual EUR of the child wells would be around 200 MBO instead of 250 MBO, Chappelle, Ellis, and Turner knew that the 2018 Drilling Program needed to be immediately revised. But none of these individuals tried to halt or revise the 2018 Drilling Program.

124.    Moreover, Turner even admitted, in another email to Chappelle in early April 2018, that the initial pattern tests (which included the Bullis-Coleman and LNU child patterns) did **not** provide a basis to assume that child wells would meet the type curve. Chappelle asked, "How do we reconcile that [80% or 200 MBO] with the correlation we consistently showed with >TC [greater than 250 MBO type curve] @1500' [spacing?]" Turner replied: "***Patterns are still early***. The correlation we showed was spacing test." In other words, the initial pattern tests (which Turner called "spacing test[s]") provided no basis for Alta Mesa's plan to drill six or more wells in a section, much less to drill high density child patterns.

125.    The evidence of the poor performance of the child wells continued to pour in. About a week later, on April 16, 2018, Turner emailed Ellis and others an Excel spreadsheet entitled "Pattern Analysis" and wrote, "Some info to ponder on . . . sorted on numbers of wells drilled." After Ellis made some suggested revisions to the "Pattern Analysis," the results still displayed that Alta Mesa was expecting an average EUR per well in its patterns of ***only 183 MBO.***

126.    The chart Turner circulated on April 16, 2018 contained the following material information:

| Development Pattern | Number Wells | EUR per Well MBO | Comment |
|---|---|---|---|
| Ash-Foster | 10 | 133 | 2 parent, 8 child |
| Bullis-Coleman | 10 | 101 | 2 parent, 8 child |
| Hoskins | 8 | 187 | 1 parent, 7 child |
| Themer | 8 | 143 | 1 parent, 7 child |
| The Trick | 7 | 251 | 1 parent, 6 child |
| Paris | 6 | 151 | 1 parent, 5 child |
| LNU | 5 | 173 | 2 parent, 3 child |
| EHU 230-233 | 4 | 104 | 3 parent |
| Todd (East) | 4 | 255 | 1 parent, 3 child |
| EHU 237,39,40,41 | 4 | 181 | 4 parent, EHU 241 not making oil |
| Huntsman | 4 | 148 | 4 parent |
| Oswald | 3 | 282 | 3 parent |
| BBD | 3 | 251 | 3 parent |
| Lankard | 3 | 206 | 1 parent, 2 child |
| **Total or Average** | | **183** | |

127.    The chart clearly showed that most of the patterns—including the recent Ash-Foster, Hoskins, Themer, and Paris patterns—had an EUR below 200 MBO. The outlier patterns with an EUR above 200 MBO either had four or fewer wells per section (Todd (East) and Lankard patterns), were sibling patterns with only three wells per section (Oswald and Borelli-Dodd (BBD) patterns), or, in the case of the Trick pattern, had just started producing oil from all wells on April 1, 2018, meaning that insufficient data existed to arrive at a reliable pattern EUR. Moreover, because the average EUR per well listed in the chart included the parent wells in the child pattern, the EUR per *child* well was even lower than the overall per-well average.

128.    The "Pattern Analysis" prepared by Turner should have caused Chappelle, Ellis, and Turner to immediately advise the AMR Board of the issues. Chappelle, Ellis, and Turner, however, did not disclose this critical information, breaching their fiduciary duties to Alta Mesa.

129.    The day after Turner circulated the "Pattern Analysis," on April 17, 2018, an Alta Mesa Reservoir Engineer emailed Ellis: "Sooner or later, the number of infill/child wells will

surpass the number of parent wells due to drilling inventory. However, ***we have seen (some) poor performance in infill wells***, which is likely due to the depletion effects of the existing parent well and inter-/intra-well production competition with both parent and other infill wells." But Ellis, once again, failed to report this information to AMR's full Board of Directors.

130.    Notwithstanding this substantial evidence indicating the poor performance of Alta Mesa's child wells and multi-well development patterns, Alta Mesa told investors on May 14, 2018 that the ***"development patterns across field are favorable."*** As demonstrated by the "Pattern Analysis," however, nothing could have been further from the truth. Alta Mesa's Directors and Officers formulated and approved this statement to investors knowing it was false or acting with reckless indifference to its veracity.

**2.      By the summer of 2018, the "cold reality" was that the average EUR of child wells was only 60% of the projected EUR, but the Directors and Officers failed to mitigate losses and save Alta Mesa's business.**

131.    Between April and August 2018, Chappelle, Ellis, and Turner learned additional information indicating that Alta Mesa's new multi-well patterns were materially underperforming stated expectations.

132.    In July 2018, Chappelle and Turner discussed the "***cold reality that the child well mean is in the 150-160 mbo range,***" a far cry from the EUR of 250 MBO projected in the 2018 Drilling Program. Specifically, on July 5, Turner emailed Chappelle:

> After laying out forecasting guidelines and having the team make a couple of passes through forecasts, ***we are facing the cold reality that the child well mean is in the 150-160 mbo range depending on how you slice the data***. Gen 2.5 wells outside of patterns are hanging in there at 250 mbo. The "danger" in simply reducing our type curve to the child mean is we will likely sell ourselves short against the backdrop of what we've seen on ESP's increasing rate and decreasing flowing BHP. ***Clearly, we've had trouble hitting production targets and this seems to be a combination of shut-ins, filling wells, and lower IP's [initial productions] on child wells***. . . .

133.    On July 27, 2018, Turner sent another email to Chappelle on "Child/Sibling EUR's," stating that the "distribution was ~177 MBO" and asking whether Chappelle nonetheless wanted to assume a "200 MBO or 225 MBO case." Chappelle responded that he wanted to go with a 225 MBO case for child and sibling wells.

134.    Then, on July 31, 2018, Turner circulated a "Type Well Process and Review" presentation to Ellis, Bourque, and others. That presentation further showed that child and sibling wells were producing oil at a rate substantially below the 250 MBO EUR type curve. As set forth in the presentation, Alta Mesa calculated child wells to have an average EUR of 150-180 MBO per well.

135.    On August 3, 2018, Turner created a graph showing the production from the patterns but excluding the parent wells in each pattern. He sent this graph (copied below) to Chappelle, stating: "When you take out the effects of the parent well producing longer than the child wells (on a normalized [cumulative] plot), a much different picture emerges.  As with past analyses, I've taken out the zero days (actually any production < 3 bopd)."



136.    The chart, even after removing "zero days," showed that the patterns were all below the type curve. Of course, this fact was not surprising to Chappelle and Turner because, as stated above, they had been discussing for many months the fact that child wells would not produce oil in line with the type curve.

137.    Notwithstanding all of their knowledge concerning the low production from the patterns and, more importantly, the child wells, Alta Mesa made the following presentation to investors on August 14, 2018, stating that "multi-well development pattern results continue to be favorable."



## Development Patterns Underway
*Multi-well development pattern results continue to be favorable*





- 74 of 86 wells drilled in 1H 2018 on multi-well pads
- Methodical approach, goal to achieve maximum present value from resource with target recovery of >8% OOIP
- Initial results from 21 patterns give distribution of outcomes for insight into well placement, completion design, and production methods including artificial lift

138.    Later, on August 29, 2018, Jack Albers ("**Albers**"), a senior reserve engineer, emailed Turner, Ellis, and others:

> As I mentioned yesterday, I have reforecast all of the Parent, Child and Sibling wells using production data through 8/23/18. ***This data indicates that wells in a pattern, whether Parent, Child, or Sibling, (Gen 2.5 only) average about 165 MBO per well versus our type well of about 240 MBO***. Parent wells in a pattern average 245 MBO, while Children are 153 MBO average. Siblings average 165 MBO per well. Sibling wells do have higher reserves than Child wells on average, by 12 MBO.

139.    Along with various attachments, Albers included the following chart showing the clear difference in EUR for parent and child wells:

| 8/18 Forecast – Gen 2.5 | Data Mean, MBO | # of Data Points | P50 Reserves, MBO | P10/P90 Slope |
|---|---|---|---|---|
| All Pattern wells | 163 | 92 | 137 | 5.33 |
| Parent + Child Patterns | 163 | 70 | 134 | 5.98 |
| Parents Only | 245 | 7 | 234 | 2.83 |
| Children Only | 153 | 63 | 126 | 6.10 |
| Siblings Only | 165 | 22 | 147 | 4.06 |
| Children + Siblings Only | 156 | 85 | 131 | 5.38 |

140.    Instead of addressing the root problem of the 2018 Drilling Program, Alta Mesa's Officers tried to rely on expensive electrical submersible pumps ("**ESPs**") to increase production from poorly performing wells. ESPs are a mechanical artificial-lift method used to increase the flow of liquids to the surface of a well; however, an ESP does not guarantee an increase in oil production. And they are very expensive: each ESP costs about $250,000 to install and $5,500 to $6,000 per month to operate—if nothing goes wrong. ESPs are also prone to breakdowns when sand clogs the pump, and repairs could increase the cost of using an ESP by up to $800,000. Notably, the STACK has a higher-than-normal sand content.

141.    Prior to the 2018 Drilling Program, Alta Mesa had very little experience with ESPs. In August 2017, Alta Mesa installed ESPs on only two wells that seemed like good candidates for the technology. As Bourque explained to Hackett after Hackett expressed interest in ESPs in February 2018, "We use ESPs selectively, but only after we understand the character of the well in terms of productivity-- the unusual wells that have high water cut and high fluid rates over an extended period." Although the ESPs installed on the two "unusual wells" were considered successful, Bourque explained, "I'm not sure I'd see the value in using ESPs early with all the associated costs, given our consistent performance with gas lift. My preference is to only pay for the lift system once instead of twice."

142.    Rejecting Bourque's advice, starting in March 2018 as dismal results began to pour in, Chappelle began a push to install as many ESPs as possible to "optimize" well results. This

was despite the high cost and despite the fact that *Alta Mesa only had data on ESPs on two admittedly "unusual" wells.* By April 12, there was a plan in place to install ESPs on 25 more wells. By the end of 2018, over 80 ESPs were installed. The Officers went all-in on this Hail Mary pass, while blindfolded.

143.    The gamble was a complete failure. Although the ESPs did at least modestly increase production of wells when they were first installed, production soon dropped off, cancelling out any early boost. Issues with sand clogging the pumps emerged almost immediately, forcing frequent shut-ins and requiring costly repairs. Thus, the use of ESPs not only materially increased Alta Mesa's capital expenditures by approximately $400,000 per well (excluding the cost of repairs), but it also failed to improve overall well performance. As a result, the use of ESPs actually reduced the profitability of the wells and made some wells completely uneconomical.

144.    Due to the very high cost of installing, operating, and repairing ESPs, the Officers' bet on a wide roll-out of ESPs was completely reckless. As with the 2018 Drilling Program overall, the Officers did not let the complete lack of evidence for a capital-intensive plan stop them from throwing money at it.

    **3.**      **In December 2018, the Directors finally acted to halt the expensive drilling program, an action they should have taken months earlier.**

145.    Despite the mounting evidence that Alta Mesa's 2018 Drilling Program was a wasteful endeavor, the Directors remained idle throughout most of 2018.

146.    Finally, on September 18, 2018, the AMR Board arranged to have Alta Mesa's officers give a technical review of upstream operations. At the technical review, Turner presented a slide deck on Alta Mesa's multi-well developments.

147.    At last, seeing the writing on the wall for the failing 2018 Drilling Program, Directors Lapeyre and Leuschen decided to retain outside consultants to evaluate the actual results from the 2018 Drilling Program.

148.    While these independent consultants were conducting their review, Chappelle and Turner continued to privately discuss the evidence clearly indicating that drilling more than a few wells per section negatively impacted the EUR of the wells. For instance, on October 10, 2018, Turner emailed Chappelle several charts, including the following, stating, "Sending to you only . . . it's a bit sobering":



149.    In late October 2018, Alta Mesa received a "Type Curve Review" analysis from VSO Petroleum Consultants ("**VSO**"). This analysis confirmed what the Directors and Officers had known or clearly should have known since early 2018: (a) the EUR of child wells was significantly below parent wells; (b) the EUR of sibling wells was greater than child wells but still less than parent wells; and (c) more than four to five wells per section materially reduced the EUR per well.

150.    Chappelle, Ellis, and Turner started working on their own analysis for AMR's Board of Directors to try to explain why it took them so long to specifically convey the poor results to the Board. One of the stated goals of this presentation was to "preempt" the reporting from the outside consultants. The other aim of this presentation was, according to Chappelle, to answer questions from the AMR Board regarding "***when you did what, and why didn't you act faster***."

151.    In an initial draft of the presentation, Turner included the following honest assessment of the 2018 Drilling Program: "***In a world with time to assess outcomes rather than ramp up promised production, it would have been more efficient to start with fewer rigs, define results and ramp up on a high-confidence development plan***." In other words, Turner admitted that Alta Mesa pursued the 2018 Drilling Program to try to satisfy the dubious promises he, Chappelle, and Ellis had made to investors prior to the Business Combination. This, of course, was not a prudent course action. The only prudent course was to take time to create a reasonable drilling plan based on actual data.

152.    In an effort to keep his job, Chappelle removed Turner's candid statement regarding the origins of the 2018 Drilling Program from the presentation before it was given to the AMR Board. Following edits made by Chappelle, the final presentation to the AMR Board touted the Officers' alleged "rapid assimilation of well/pattern results." Chappelle, of course, knew that Alta Mesa did not rapidly assimilate well pattern results when he, Turner, and Ellis had recognized the clear problems with the patterns back in March and April 2018.

153.    The board presentation created by Turner, Chappelle, and Ellis also continued to spin results from the patterns. In the board presentation, Turner and Chappelle did their best to explain why it took them until late 2018 to fully convey to the AMR Board the problems with the patterns. In particular, the presentation highlighted that six of eight patterns from late 2017 and

early 2018 were above the 250 MBO type curve at 60 days of production. But the line graph reflecting the performance of these eight patterns aggregated production from the parent wells with production from the child wells. By including the parent well production—production that may have happened months, if not years, before the child wells were completed—Chappelle, Ellis, and Turner continued their misleading narrative. In reality, as explained above, they knew in early 2018 that the majority of newly drilled child wells were not meeting the 250 MBO type curve.

154.    The AMR Board, however, ultimately had enough of Chappelle's, Ellis's, and Turner's attempts to defend their management of Alta Mesa's drilling program. The AMR Board effectively fired Chappelle and Ellis (although each technically resigned after being asked to do so). The AMR Board then installed a new management team.

155.    The end result of the 2018 Drilling Program is reflected in the following graph created by new management:



156.    As demonstrated by the above graph, Alta Mesa substantially ramped up drilling activities after February 2018, with the majority of drilling focused on child and sibling wells. While the EUR per well likely was always going to trend downward due to the need to drill child wells, Alta Mesa never should have ramped up drilling—including by operating at least eight rigs simultaneously—until it had gathered sufficient data to determine the optimal drilling program.

157.    Had the Directors and Officers abided by their fiduciary duties instead of pursuing an unproven and reckless drilling program, Alta Mesa would have learned early in 2018 that the optimal spacing strategy was around four to five total wells per section. And, armed with this knowledge, Alta Mesa's Directors and Officers could and would have developed a drilling plan that maximized the NPV of the wells, along with ensuring that Alta Mesa had sufficient cash flow and liquidity to continue to operate in future years.

**E.    In 2019, Alta Mesa's New Officers Developed a Reasonable Drilling Plan, But Alta Mesa Was Unable to Overcome the Damage Created by the 2018 Drilling Program.**

158.    In early 2019, Alta Mesa, now with new management, realized that the company needed to conduct a full review of the data to develop an optimal and economically rational development plan. Alta Mesa paused drilling activity and spent around three months doing a thorough analysis, including a bottoms-up technical and commercial evaluation.

159.    Following this analysis, Alta Mesa's new management concluded that adding more than five wells per section was not economical. Specifically, as set forth in Alta Mesa's annual report for 2018, Alta Mesa concluded:

- ***No distinct benches exist within the Mississippian section that are not in direct communication with each other resulting in only four to five wells per section*** that we believe should be spaced horizontally 1,000 feet or more apart;

- Year-end PUD [proved undeveloped] type curves for future development are estimated to have reserves of 175 Mbbl [MBO] per well, down from the 250 Mbbl at the time of the Business Combination;

- Year-end proved reserve spacing per section is assumed at four or five wells per section which is roughly equivalent to the assumptions at the time of the Business Combination;

- Year-end probable and possible resource individual well recovery was assessed to be 200 Mbbl compared to 250 Mbbl at the time of the Business Combination;

- Year-end probable and possible resource spacing assumes no additional wells per section on fully developed proved sections; and

- No incremental recovery expected from contingent resources.

160.   Alta Mesa could and would have reached these or similar conclusions a year earlier had the Directors and Officers acted reasonably and tested assumptions before ramping up drilling activities. And, had the Directors and Officers exercised their fiduciary duties, they would have curtailed rig deployment and stopped the drilling and completion of unnecessary and uneconomical wells by limiting patterns to at most five wells.

161.   Alta Mesa restarted its development program in March 2019 and expected to use two to three rigs for the remainder of 2019. The company, however, lacked sufficient liquidity to stabilize its production at a level adequate to service its debt and remain in compliance with certain loan covenants. In short, the wasteful 2018 Drilling Program doomed the company's ability to continue as a going concern.

162.   As a direct result of the disastrous 2018 Drilling Program, Alta Mesa filed for bankruptcy in September 2019.

**F.     Alta Mesa Suffered Hundreds of Millions of Dollars in Damages After the Business Combination.**

163.    As set forth above, Alta Mesa budgeted over $500 million in capital expenditures for drilling and completing wells in 2018. This budget was unreasonable because it was based on the flawed assumption—recklessly approved by the Directors and Officers—that Alta Mesa could and should pursue the aggressive 2018 Drilling Program. Had the Directors and Officers abided by their fiduciary duties rather than acting with gross negligence and reckless disregard to such duties, Alta Mesa would have budgeted to expend considerably less capital in 2018 and would have stayed within that budget.

164.    Not only was the 2018 Capex Budget wholly unreasonable, but the Directors and Officers also failed to ensure that Alta Mesa kept its drilling and completion costs in line with that budget. Between February and December 2018, Alta Mesa ultimately expended more than $767 million on the 2018 Drilling Program. That amount exceeded the total STACK-related capital expenditures from 2017 ($356 million) and 2016 ($209 million) combined.

165.    A significant portion of post-Business Combination capital expenditures could and would have been saved but for the Directors' and Officers' breaches of fiduciary duty. Between February 2018 and December 2018, Alta Mesa spent hundreds of millions of dollars to drill and complete wells that either were not economically viable or from which the estimated rate of return was so small that it left no margin of error in the event of even a small decrease in the price of oil. Had Alta Mesa's Directors and Officers exercised the requisite care in operating the business, Alta Mesa would have drilled less wells per section, thereby saving hundreds of millions of dollars. Moreover, had Alta Mesa's Directors and Officers acted prudently (instead of recklessly), they would have reduced per-well capital expenditures and, at the very least, ensured that such capital expenditures did not exceed the budget.

166.    In sum, the 2018 Drilling Program made Alta Mesa's newly drilled wells less economical, causing hundreds of millions of dollars in lost revenue and profit and other lost value.

167.    In addition to the losses caused by drilling too many wells per section and failing to control and reduce per-well capital expenditures, Alta Mesa suffered additional damages by being forced to file bankruptcy. The bankruptcy itself was costly, and it resulted in Alta Mesa having to sell its oil and gas properties at liquidation values. Alta Mesa's bankruptcy and the forced sale of its assets would have been avoided had Alta Mesa's Directors and Officers not breached their fiduciary duties.

168.    The Directors and Officers knew that Alta Mesa's business required significant capital expenditures to maintain exploration, drilling, and production activities. Indeed, they signed (or helped prepare) public securities filings that expressly acknowledged that "the business of exploring for, developing or acquiring reserves is capital intensive" and that "[r]ecovery of our reserves, particularly undeveloped reserves, will require significant additional capital expenditures and successful drilling operations."

169.    The Directors and Officers further knew that any sort of disruption in Alta Mesa's ability to fund capital expenditures with operating cash flows or external capital sources could cripple the business, preventing Alta Mesa from tapping hundreds of millions of dollars of oil and gas. They signed (or helped prepare) public securities filings that expressly admitted: "To the extent cash flow from operations is reduced and external sources of capital become limited or unavailable, our ability to make the necessary capital investment to maintain or expand our asset base of oil and natural gas reserves would be impaired."

170.    Finally, the Directors and Officers knew that Alta Mesa's ability to make the significant capital expenditures necessary to develop and monetize its substantial reported reserves

depended on operating cash flow and the approximately $500 million of cash provided in the Business Combination. The Directors and Officers signed (or helped prepare) public filings stating that Alta Mesa's plan was "to finance our future capital expenditures predominantly with cash flows from operations and with proceeds we received in the business combination."

171.     Despite all that, the Directors and Officers nevertheless gambled the entirety of Alta Mesa's cash reserves in the 2018 Drilling Program. Doing so necessarily meant that there would be no "rainy day fund" to help finance the massive capital expenditures to develop the reserves in future years, meaning that future development would depend almost entirely on cash flow generated from operations. If the 2018 Drilling Program did not lead to massive operating cash flow to spur future capital expenditures, then the whole business would necessarily collapse. That is what happened, as the Directors and Officers reasonably should have known it would.

172.     The Directors' and Officers' approval and implementation of the 2018 Drilling Program and failure to curtail that program, when they should have known it was wasteful and unsustainable, directly caused Alta Mesa to suffer a liquidity crisis in 2019. This crisis inhibited Alta Mesa's capacity to continue making necessary capital expenditures to generate revenue as its existing well production naturally declined, thereby destroying Alta Mesa's ability to continue as a business.

173.     Notably, due to unnecessary costs associated with the 2018 Drilling Program, Alta Mesa had to write off a material portion of its assets. Part of Alta Mesa's assets were its proved, undeveloped oil and reserves. But these reserves may only be recorded as an asset if a company has the financial wherewithal to drill and complete the wells necessary to develop the reserves. Likewise, Alta Mesa also had to write off the value of its unproved oil and gas reserves.

174.    Because Alta Mesa lacked the liquidity and capital to continue drilling, it had to write off hundreds of millions of dollars in assets in 2019 (in addition to the impairment of assets due to the lack of recoverable oil generally). This reduction in reported assets compounded Alta Mesa's financial woes and thus further contributed to the company's bankruptcy.

175.    But for the unnecessary and wasteful capital expenditures in 2018, Alta Mesa would not have filed bankruptcy in 2019 and would not have been forced to sell its assets in a fire sale in 2020. That is, but for the Directors' and Officers' breaches of fiduciary duty, Alta Mesa would have continued as a business and generated revenue and profits.

176.    Specifically, but for the Directors' and Officers' breaches of fiduciary duty, Alta Mesa would have retained more cash, capital, and general liquidity by the end of 2018. Alta Mesa would have been a smaller company than it was at the time of the Business Combination, but it would have been able to continue to explore and drill.

177.    Had Alta Mesa followed a prudent and data-driven drilling plan to develop its properties in a sustainable, profit-maximizing manner, it would have earned tens of millions of dollars more in revenue and profits from operations than what it did. Alta Mesa could have avoided any liquidity crisis or disruption to its ability to make crucial future capital expenditures had it only: (a) drilled in an optimal and sustainable manner; and (b) not immediately squandered all of its cash reserve buffers. The positive effects of optimal development—thereby avoiding any capital expenditure disruptions—would have compounded over time.

178.    Moreover, because a prudent, data-driven, and profit-maximizing drilling plan would have avoided bankruptcy, Alta Mesa could have realized far more value from its oil and gas properties even to the extent that it itself could not develop those properties. Alta Mesa would have obtained far more for the properties that it sold in bankruptcy in a distressed asset sale at a time of

unprecedented crisis—not far removed from when WTI futures contracts settled at ***negative prices***—had Alta Mesa been able to sell those properties—or some subset thereof—outside of bankruptcy at the time of its choosing. Alta Mesa suffered substantial damages from being forced to liquidate its oil and gas assets in a distressed asset sale at liquidation value during a sub-optimal tine-period. Indeed, Alta Mesa obtained less than $200 million for properties that the Directors and Officers told the market were worth over one billion dollars.

179.    In short, Alta Mesa's bankruptcy destroyed the value of the company. But this bankruptcy could have been avoided. If the Directors and Officers had acted prudently (instead of recklessly), Alta Mesa would still be in operation today.

**G.    Prior to Confirmation of the Plan, the Bankruptcy Court Heard Incomplete and Inaccurate Testimony and Evidence Regarding the 2018 Drilling Program.**

180.    Prior to confirmation of the Plan and creation of the Litigation Trust, the Bankruptcy Court heard limited evidence concerning the 2018 Drilling Program. Unfortunately, even the limited evidence presented to this Court was, in many instances and respects, inaccurate.

181.    Hackett testified in December 2019 regarding, among other things, the 2018 Drilling Program. Hackett claimed that it took "almost four" months for Alta Mesa to realize that newly drilled wells were not performing as expected, stating: "It was a really interesting model, and in this regard it was a bit atypical for our business, is that for almost 120 days, so almost four months, from when you initially drilled the patterns, before you found out that they weren't performing against type curve." Hackett's testimony—even assuming he was being truthful— demonstrates he and the rest of the Directors utterly failed to understand the actual evidence (if not worse). The truth, as set forth above, is that the majority of the newly drilled wells were underperforming relative to the type curve prior to 120 days of production.

182.    Hackett also testified: "It was only after we collected enough data, literally by about the third quarter, towards the end of that, that we actually started to see that it [the reservoir] wasn't performing as well." Again, Hackett's testimony—even if credited as truthful—reveals that he and the other Directors had disregarded their duties to oversee the business. Contrary to Hackett's claim, there was evidence in April 2018—well before the third quarter of 2018—demonstrating that the new patterns were not performing well. In fact, by April 2018, the evidence showed that, of eleven patterns with four or more wells, *only two had an average per-well EUR of around 250 MBO*. And, to reiterate, because Alta Mesa often aggregated the parent production with the newly drilled child wells, it is possible that the two patterns that were in-line with expectations were overstated by high-performing parent wells.

183.    Hackett was not the only one who provided testimony to the Bankruptcy Court on the 2018 Drilling Program. AMH's former chief restructuring officer also testified regarding his understanding of that program. He, however, mistakenly testified about the actual evidence.

184.    For instance, when asked about how the 2018 Drilling Program "perform[ed] throughout the course of 2018," the former restructuring officer stated:

> I think it's important to note that with these types of wells and general oil and gas wells—there's a period of time between when you initially have your production come online and you have enough data points to evaluate if your well is performing as forecasted. And so for the wells that were drilled, they had a forecast of what's known as a "type curve" for each well and then as actual results come in, you plot the actuals against the forecasted curve. ***And for the first part of 2018, the wells were performing by and large in line with expectations*** and as four months—three or four months, which is the typical amount of time that you would need to collect the data points to evaluate this, they started to show some degradation against the performance that they had forecasted.

For the same reason that Hackett's testimony was inaccurate, so was  former restructuring officer's testimony. Specifically, as set forth above, the new wells were ***not*** performing in line with expectations for the first part of 2018.

185.     The former restructuring officer also testified that he believed that it took "roughly three or four months after February" for Alta Mesa to get the new pattern results in. But, in reality, Alta Mesa's first new patterns had started producing oil in late 2017 and January 2018. The Ash-Foster and Hoskins patterns, for instance, were producing oil from all wells in December 2017. These patterns were, as described above, critical first patterns because although Alta Mesa touted them as "development" patterns (as opposed to "test" patterns), they were the first and only patterns that Alta Mesa had drilled with a significant number of child wells and an average well spacing of more than 600 feet between wells. By April 2018, Alta Mesa had production from these patterns demonstrating that new wells were not producing oil in line with expectations.

186.     The former restructuring officer further testified:

So there was one pattern that underperformed from the beginning, and a "pattern" meaning a series of wells drilled in one specific section. But other than that one specific pattern that unperformed from the start, the vast majority of the wells that were drilled all performed, you know, at or above expectations. ***And then in June and July of 2018, performance of those wells really started to revert back to that one specific pattern that was underperforming from the beginning***.

187.     But it did not take until June and July of 2018 for Alta Mesa to have evidence that the patterns were "underperforming." By July 2018 Alta Mesa had evidence showing that the new wells were not merely "underperforming," but rather not expected to have an EUR anywhere close to expectations. To reiterate, in early July, Alta Mesa's Officers were discussing the "***cold reality that the child well mean is in the 150-160 mbo range***." This roughly 40% drop in the EUR clearly did not happen overnight. Instead, the evidence shows that this decline in the EUR was recognized back in April 2018, and the production from the wells simply got worse between April and July 2018.

## JURY TRIAL DEMANDED

188.     The Trust hereby demands a jury trial on all issues.

## CAUSES OF ACTION

## Count 1: Breach of Fiduciary Duty Against the Directors

189.     The Trust repeats and realleges the allegations set forth above.

190.     Hackett, Lapeyre, Leuschen, Dimitrievich, Chappelle, and Ellis were Directors of AMR. Hackett, Chappelle, and Ellis also were Directors/Managers of Alta Mesa GP.

191.     The Directors owed fiduciary duties, including the duties of care and loyalty, to Alta Mesa.

192.     Pursuant to Alta Mesa's limited partnership agreement, Alta Mesa GP owed Alta Mesa the duty to manage the company "in accordance with the standards of the industry" and perform their fiduciary duties "with ordinary prudence and in a manner characteristic of a businessman in similar circumstances." Because the Directors controlled Alta Mesa GP and thus were ultimately responsible for managing Alta Mesa, they owed Alta Mesa a similar duty to act "with ordinary prudence."

193.     The Directors breached their fiduciary duties to Alta Mesa. In approving the 2018 Drilling Program, they failed to act "in accordance with the standards of the industry" and perform their fiduciary duties "with ordinary prudence and in a manner characteristic of a businessman in similar circumstances." A fiduciary of Alta Mesa, acting with ordinary prudence and in accordance with the standards of the industry, would not have approved the 2018 Drilling Program and the capital expenditures required to conduct that program.

194.     Moreover, the Directors failed to act with ordinary prudence in monitoring the results of the 2018 Drilling Program. More specifically, the Directors failed to act with ordinary prudence by not stopping the 2018 Drilling Program in the first half of 2018. A fiduciary of Alta Mesa, acting with ordinary prudence and in accordance with the standards of the industry, would have acted much sooner than December 2018 to curtail cost and reevaluate drilling plans.

195.     The Directors further breached their fiduciary duties to Alta Mesa by acting with gross negligence in their approval of the 2018 Drilling Program. In addition, the Directors breached their fiduciary duties to Alta Mesa by acting with gross negligence in failing to stop the 2018 Drilling Program in the first half of 2018. In short, the Directors' conduct was the result of a conscious indifference to the financial and business welfare of Alta Mesa.

196.     Moreover, Chappelle and Ellis, in their capacity as Directors, acted in bad faith by not disclosing material facts concerning the 2018 Drilling Program to the rest of the AMR Board. Specifically, Chappelle and Ellis knew by April 2018, if not earlier, that recently completed child wells had an EUR materially lower than 250 MBO. They also knew that increasing the density of wells in a section was leading to a decrease in the EUR per well in the section relative to the type curve. But they failed to timely provide this and other material information concerning the 2018 Drilling Program to the full AMR Board or otherwise act to stop the 2018 Drilling Program, curtail expenses, and thereafter implement a prudent drilling plan.

197.     Had the full AMR Board been aware of the facts known by Chappelle and Ellis in March/April 2018, the AMR Board would have stopped the 2018 Drilling Program in the Spring of 2018 and taken actions similar to those that it took in December 2018, including, without limitation, drilling less wells per section and operating fewer rigs.

198.     As a direct and proximate result of the Directors' breaches of fiduciary duty, Alta Mesa suffered hundreds of millions of dollars in damages after the Business Combination, in an amount to be proven at trial.

### Count 2: Breach of Fiduciary Duty Against Chappelle, Ellis, and Turner
### in Their Capacity as Officers

199.    The Trust repeats and realleges the allegations set forth above.

200.    Chappelle, Ellis, and Turner were actual or de facto officers, agents, and fiduciaries of AMR and Alta Mesa GP.

201.    Chappelle, Ellis, and Turner owed fiduciary duties, including the duties of care and loyalty, to Alta Mesa.

202.    Pursuant to Alta Mesa's limited partnership agreement, Alta Mesa GP owed Alta Mesa the duty to manage the company "in accordance with the standards of the industry" and perform their fiduciary duties "with ordinary prudence and in a manner characteristic of a businessman in similar circumstances." Because Chappelle, Ellis, and Turner were ultimately responsible for managing Alta Mesa, they owed Alta Mesa a similar duty to act "with ordinary prudence."

203.    Chappelle, Ellis, and Turner breached their fiduciary duties to Alta Mesa. In failing to inform the AMR Board in February 2018 about the known, material risks associated with pursuing the 2018 Drilling Program, they failed to act "in accordance with the standards of the industry" and perform their fiduciary duties "with ordinary prudence and in a manner characteristic of a businessman in similar circumstances." A fiduciary of Alta Mesa, acting with ordinary prudence and in accordance with the standards of the industry, would have advised the AMR Board that Alta Mesa needed to await the results from recent patterns, assess that data, and then develop a go-forward drilling plan. Instead of providing this advice, Chappelle, Ellis, and Turner encouraged the pursuit of the costly 2018 Drilling Program.

204.    Chappelle's, Ellis's, and Turner's failures to advise the AMR Board in February 2018 about the known, material risks associated with pursuing the 2018 Drilling Program was not

just negligent, but grossly negligent. Their conduct was the result of a conscious indifference to the financial and business welfare of Alta Mesa.

205.    Moreover, Chappelle, Ellis, and Turner, in their capacity as officers of Alta Mesa, acted in bad faith by not disclosing material facts concerning the 2018 Drilling Program to the rest of the AMR Board. Specifically, Chappelle, and Turner knew by April 2018, if not earlier, that recently completed child wells had an EUR materially lower than 250 MBO. They also knew that increasing the density of wells in a section was leading to a decrease in the EUR per well in the section relative to the type curve. But they failed to timely provide this and other material information concerning the 2018 Drilling Program to the full AMR Board or otherwise act to stop the 2018 Drilling Program, curtail expenses, and thereafter implement a prudent drilling plan.

206.    Had the full AMR Board been aware of the facts known by Chappelle, Ellis, and Turner in March/April 2018, the AMR Board would have stopped the 2018 Drilling Program in the Spring of 2018 and taken actions similar to those that it took in December 2018, including, without limitation, drilling less wells per section and operating fewer rigs.

207.    As a direct and proximate result of Chappelle's, Ellis's, and Turner's breaches of fiduciary duty, Alta Mesa suffered hundreds of millions of dollars in damages after the Business Combination, in an amount to be proven at trial.

## **REQUEST FOR RELIEF**

THEREFORE, Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that upon trial of this cause, judgment be entered in Plaintiff's favor, and against Defendants, for the following:

a.      All actual and compensatory damages;

b.        Pre- and post-award interest at the highest rate and amount authorized by applicable law;

c.        An award of costs related to this proceeding, including attorneys' fees; and

d.        Such other and further relief at law or in equity as the Court deems just and appropriate.

Dated: August 3, 2021

REID COLLINS & TSAI LLP

*/s/ Joshua J. Bruckerhoff*
Joshua J. Bruckerhoff
Attorney-in-Charge
State Bar No. 24059504
jbruckerhoff@reidcollins.com
William T. Reid, IV
State Bar No. 00788817
wreid@reidcollins.com
Jason A. Cairns
State Bar No. 24097447
jcairns@reidcollins.com
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
T: (512) 647-6100
F: (512) 647-6129

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 3rd day of August, 2021, a true and correct copy of the above and foregoing was served on all parties registered with the ECF.


Dated: August 3, 2021                              */s/ Joshua J. Bruckerhoff*
                                                    Joshua J. Bruckerhoff