United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 13, 2022

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 19-35133** |
| **ALTA MESA RESOURCES, INC.,** *et al.*, | § | |
| | § | **CHAPTER 11** |
| Debtors. | § | |
| | § | |
| **DAVID DUNN,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 21-3423** |
| | § | |
| **HARLAN H. CHAPPELLE,** *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

David Dunn, the Trustee of the Alta Mesa Holdings Litigation Trust, brought this suit against certain former directors and officers of Alta Mesa Holdings, LP ("Alta Mesa"), Alta Mesa Resources, Inc. ("AMR"), and Alta Mesa, LLC ("Alta Mesa GP"). Dunn alleges the defendants breached their fiduciary duties to Alta Mesa by approving and continuing to operate a drilling program despite early indications of lower-than-predicted production levels. Certain defendants filed a motion to dismiss on the basis that (i) they did not owe fiduciary duties to Alta Mesa; or (ii) the business judgment rule protects their actions. The Court dismisses Dunn's claims against Hackett, Lapeyre, Leuschen, and Dimitrievich. The claims against Chappelle, Ellis, and Turner are not dismissed.

## BACKGROUND

At the time of the alleged breaches, the defendants held various positions as officers and directors of Alta Mesa, AMR, and Alta Mesa GP. (ECF No. 50 at 13). The defendants approved

and operated a drilling program in early 2018. (ECF No. 50 at 26–27). The drilling program proved unsuccessful and strained Alta Mesa financially. (ECF No. 50 at 47–48). Dunn argues that the approval and continued operation of the drilling program constituted a breach of the defendants' fiduciary duties. (ECF No. 50).

In February 2018, Alta Mesa received approximately $700 million in cash as the result of a merger with a special purpose acquisition company and a midstream company. Alta Mesa used the cash to pay off debts and to fund operations, including the drilling program at the heart of this dispute. (ECF No. 50 at 24).

## I.    FACTUAL BACKGROUND

The Court begins with an overview of the organizational structure of Alta Mesa and its affiliates.

### A.    The Affiliates' Relationship to Alta Mesa

Alta Mesa, a Texas limited partnership, had a multi-layered ownership structure. At the top was AMR, a Delaware corporation, which owned and controlled SRII OpCo GP, LLC. (ECF No. 50 at 13). SRII OpCo GP, LLC was the general partner of SRII OpCo, LP. (ECF No. 50 at 13). SRII OpCo, LP held Alta Mesa's limited partnership interests while Alta Mesa GP, a Delaware limited liability company, was Alta Mesa's general partner. (ECF No. 50 at 13).

### B.    The Defendants' Relationship to Alta Mesa and its Affiliates

Harlan Chappelle served as CEO of Alta Mesa and as CEO, President, and director of Alta Mesa GP until his resignation on December 26, 2018. (ECF No. 50 at 14). Chappelle also acted as CEO of AMR and sat on AMR's board of directors until his resignation. (ECF No. 50 at 14).

Michael Ellis served as COO of Alta Mesa and as a director of Alta Mesa GP until his resignation on December 26, 2018.  (ECF No. 50 at 14).  Ellis also served as the COO of Alta Mesa GP and sat on the AMR board of directors until his resignation.  (ECF No. 50 at 14).

James Hackett served as executive chairman of the AMR board of directors and as a director of Alta Mesa GP.  (ECF No. 50 at 14).  Hackett also served as interim CEO of Alta Mesa GP from Chappelle's resignation until September 11, 2019.  (ECF No. 50 at 14).

Donald Dimitrievich, Pierre Lapeyre, and David Leuschen each served on AMR's board of directors.  (ECF No. 50 at 14).

Tim Turner served as Vice President of Corporate Development and Reserves at Alta Mesa.  (ECF No. 50 at 15).

There are three defendant categories: (1) the AMR board of directors (Chapelle, Ellis, Hackett, Dimitrievich, Lapeyre, and Leuschen); (2) the Alta Mesa GP officers (Chapelle, Ellis, and Hackett); and (3) the Alta Mesa officers (Chapelle, Ellis, and Turner).

### C.    The Drilling Program

Prior to the business combination and implementation of the drilling program, the Alta Mesa officers allegedly knew of or were involved in testing at certain drilling sites in contemplation of a new drilling program in the Oklahoma STACK[1].  (ECF No. 50 at 19–21).  Alta Mesa's testing began in 2014 and involved drilling multi-well test patterns containing both "child" and "sibling" wells.  (ECF No. 50 at 18).  A "child" well is drilled on a site with a pre-existing well.  (ECF No. 50 at 18).  A "sibling" well is the contemporaneous drilling of more than one well on a site.  (ECF No. 50 at 18).  Alta Mesa had seven producing multi-well test patterns by the time of the merger, including two patterns which involved child wells and five which involved only

---

[1] "STACK" is an acronym for "Sooner Trend, Anadarko, Canadian and Kingfisher", a geographic area in Northern Oklahoma.

siblings.  (ECF No. 50 at 18–19).  Both child and sibling drilling patterns pose an inherent risk that the drilling of close proximity wells may result in lower average production.  (ECF No. 50 at 18). Upstream companies like Alta Mesa conduct testing to determine the optimum number of wells that should be drilled to develop a site.  (ECF No. 50 at 17).

Dunn contends that testing at the time of merger indicated that only two of the sibling patterns produced results in line with Alta Mesa's type curve.  Type curves are projections of how a well will perform based on historical data and by comparison to wells with similar characteristics. (ECF No. 50 at 19).  As of December 2017, the average estimated ultimate recovery from each of the five sibling patterns was below the 250 thousand barrels of oil that Alta Mesa had originally projected.  (ECF No. 50 at 19).  The highest number of wells drilled on any one of the seven test patterns was five wells.  (ECF No. 50 at 19).  The drilling program proposed drilling 12 wells per section and projected an average recovery of 250 thousand barrels per well.  (ECF No. 50 at 24). Alta Mesa planned to drill almost twice as many wells in 2018 as it had in 2017.  (ECF No. 50 at 24).  The drilling program focused on drilling child wells because many of the sites already contained wells, despite most of the testing involving only sibling wells.  (ECF No. 50 at 24). Additionally, the program proposed increasing the number of operating rigs, which would require large upfront costs.  (ECF No. 50 at 24).

The AMR board met in February 2018 to approve the drilling program.  (ECF No. 50 at 25).  The board allegedly did not consider—or did not adequately consider—the test pattern data before or during this meeting.  (ECF No. 50 at 25–26).  Dunn argues that the data did not support the design of the 2018 drilling program, and certain defendants knew or should have known that drilling multi-well patterns in the proposed formation would reduce overall production.  (ECF No. 50 at 25–26).  However, the AMR board approved a $566 million budget for the drilling program

on the assumption that the new wells would recover an average of 250 thousand barrels.  (ECF No. 50 at 27).

Turner and Ellis allegedly learned by March 2018 that several of the child well patterns' productions were insufficient to justify the drilling program.  (ECF No. 50 at 29).  Dunn alleges that neither Turner nor Ellis brought these results to the attention of the board, nor did they take measures to alter the drilling program.  (ECF No. 50 at 29).  Instead, Chappelle and Turner omitted the poor results in a "cleaned up" version of the data.  (ECF No. 50 at 32).  They also allegedly re-calculated pattern averages to exclude the lowest-producing wells.  (ECF No. 50 at 32).  Chappelle, Ellis, and Turner knew that the Alta Mesa child wells would have ultimate recoveries at least 20% lower than their parent wells, and some data showed an average ultimate recovery of 183 thousand barrels.  (ECF No. 50 at 35–36).  Nevertheless, the three officers represented to investors that "development patterns across field are favorable."  (ECF No. 50 at 38).

By the summer of 2018, the Alta Mesa officers recognized that the child wells produced an average of 150–160 thousand barrels—only 60% of the projected production.  (ECF No. 50 at 38).  Again, despite knowledge of the underperformance, the Alta Mesa officers described the pattern results as "favorable" to investors.  (ECF No. 50 at 40).  To increase well production and save the drilling program, the Alta Mesa officers decided to install electrical submersible pumps on the under-performing wells, costing approximately (i) $250,000.00 each to install; plus (ii) monthly charges of about $6,000.  (ECF No. 50 at 42).  Alta Mesa installed 80 pumps by the end of 2018.  (ECF No. 50 at 42–43).  The effort cost nearly $400,000 per well, but ultimately failed to increase production.  (ECF No. 50 at 43).

In September 2018, the AMR board arranged for outside consultants and the Alta Mesa officers to present a technical review of the drilling program.  (ECF No. 50 at 43).  Dunn alleges

that the Alta Mesa officers prepared their own analysis in which they continued to "spin results" in order to "preempt the reporting from outside consultants."  (ECF No. 50 at 45).  Allegedly, the Alta Mesa officers deleted statements from the presentation in which they would have admitted that the drilling program was unwise based on available data.  (ECF No. 50 at 45–46).  The officers' presentation also included parent well production in their data analysis from "months, if not years" before the child wells were completed in an effort to manipulate the results.  (ECF No. 50 at 45–46).  Chappelle and Ellis resigned in December 2018 at the board's request.  (ECF No. 50 at 46).

Dunn alleges that had the defendants not approved and continued to operate the drilling program throughout 2018, Alta Mesa would not have spent over $767 million on the drilling program and would have retained enough cash reserves to constitute a "rainy day fund."  (ECF No. 50 at 49).

## II.    PROCEDURAL BACKGROUND

Alta Mesa's plan created the AMH Litigation Trust and assigned certain causes of action to the Trust.  (Case No. 19-35133, ECF No. 1562 at 41–45).  Dunn, as trustee of the Trust, brought this adversary proceeding against the defendants on May 12, 2021.  (ECF No. 50 at 1).  Certain defendants filed a motion to dismiss, and other defendants filed replies in support of that motion. (*See* ECF Nos. 67; 74; 75).  The defendants argue that they owed no fiduciary duties to Alta Mesa, and, even if they did, they did not breach those duties.  (ECF No. 67 at 19).  Dunn filed a brief in opposition.  (ECF No. 71).  The Court conducted a hearing on the motion to dismiss on November 3, 2021 and took the matter under advisement.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1334.  A proceeding is "related to" a case under title 11 if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).  A bankruptcy court's "related to" jurisdiction narrows post-confirmation. *Natixis Funding Corp. v. GenOn Mid-Atl., L.L.C. (In re GenOn Mid-Atl. Dev., L.L.C.)*, 42 F.4th 523, 534 (5th Cir. 2022). The relevant question for "related to" jurisdiction post-confirmation is whether "the dispute 'pertain[s] to the implementation or execution' of the debtor's reorganization plan[.]" *Id*. (citing *U.S. Brass Corp. v. Travelers Ins. Grp. (In re U.S. Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002)).

In *GenOn*, the Fifth Circuit concluded that it is not enough that litigation may deplete estate resources to find that a matter is "related to" the execution of a plan of reorganization—such a rule would be far too broad and encompass too many lawsuits.  *Id*. at 538.  However, the Fifth Circuit clarified that this does not mean a dispute must threaten to "torpedo" a reorganization to find that it relates to the bankruptcy.  *Id*. at 537.  Instead, the dispute merely "must implicate a specific plan's provision or the parties' bankruptcy-law rights or responsibilities." *Id*. at 538.  Therefore, even where the parties' bankruptcy-law rights are not implicated, a post-confirmation dispute may still fall within the bankruptcy court's jurisdiction if it deals primarily "with '[pre]-confirmation relations between the parties.'"  *Id*. at 539 (reconciling the Fifth Circuit's broad interpretation of related-to jurisdiction with its earlier holding in *Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 391(5th Cir. 2001)).  For example, a matter "pertain[s] to the implementation or execution of the bankruptcy plan" where "one of the parties to [a] suit

ha[s] assigned its recovery to a trust created by the debtor's plan 'for the benefit of unsecured creditors.'" *Id.* at 536 (quoting *In Re Biloxi Casino Belle Inc.*, 368 F.3d 491 (5th Cir. 2004)).

This post-confirmation dispute involves a state law claim that arose pre-petition and was assigned to the AMH Litigation trust as part of the plan.  (ECF No. 50 at 13).  It does not implicate the parties' bankruptcy-law rights, but it does implicate a provision of the confirmed plan and deal with the parties' pre-bankruptcy relations.  The plan established the AMH Litigation Trust for the purpose of evaluating and prosecuting causes of action for the benefit of the holders of Litigation Trust Interests, which includes certain creditors.  (Case No. 19-35133, ECF No. 1562 at 41–45). The plan is, at least in part, premised upon the understanding that certain of Alta Mesa's creditors could later recover from claims brought by Dunn, including the defendants' alleged breach of fiduciary duty.  Executing the plan necessarily involves the pursuit of those claims.  Therefore, the claims against the defendants pertain to the execution of the plan, and the Court has "related to" jurisdiction over them.  *See GenOn*, 42 F.4th at 536 (citing *Biloxi Casino Belle*, 368 F.3d 491 (5th Cir. 2004) (providing an example of "related to" jurisdiction over state-law disputes when "one of the parties . . . assigned its recovery to a trust created by the debtor's plan 'for the benefit of unsecured creditors.'")

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) affords defendants relief from a plaintiff's defective complaint.  FED. R. CIV. P. 12.  Federal Rule of Bankruptcy Procedure 7012(b) applies Rule 12(b) to adversary proceedings.  FED. R. BANKR. P. 7012(b).

To defeat a 12(b)(6) motion, the plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A complaint

plausibly states a claim for relief when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Plausibility," at the Rule 12(b)(6) stage, does not mean "possibility." *Id.* at 679. A complaint that offers bare legal conclusions, unsupported by well-pleaded factual allegations tending to establish a plausible basis for relief, must be dismissed. *See id.* at 679–80 (citing *Twombly*, 550 U.S. at 551, 555, 565–67, 570) (explaining that legal conclusions cannot be taken as true without factual support). The Court reviews motions under Rule 12 (b)(6) "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007).

## DISCUSSION

To prevail on a claim for breach of fiduciary duty, a plaintiff must prove: (i) a fiduciary relationship between plaintiff and defendant; (ii) the defendant breached that duty; and (iii) the breach resulted in injury. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277 (5th Cir. 2007) (citing *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex.App.—Dallas 2006, pet. denied)).

Viewing the facts in the light most favorable to Dunn, the complaint fails to sufficiently plead the first element—the existence of a fiduciary relationship between the defendants and Alta Mesa—with respect to Hackett, Lapeyre, Leuschen, and Dimitrievich. Dunn sufficiently pleads this element with respect to Chappelle, Ellis, and Turner. Dunn's allegations plausibly meet the second and third elements for a claim of breach of fiduciary duty for Chapelle, Ellis, and Turner. The Court grants the motion to dismiss only as to Hackett, Lapeyre, Leuschen, and Dimitrievich.

I.    **FIDUCIARY DUTIES**

The complaint alleges that certain of the defendants held multiple roles at multiple levels of Alta Mesa and its affiliates.  (ECF No. 50 at 13).  The Court separately examines each of the defendants' roles.

A.    **The AMR Directors**

Dunn brings claims against Dimitrievich, Lapeyre, Leuschen, Chappelle, Ellis, and Hackett as directors of AMR.  (ECF No. 50 at 13).  Dunn uses the organizational structure of Alta Mesa and its affiliates to conclude that "the Directors and Officers of AMR owed a fiduciary duty to Alta Mesa as the 'human controllers' of Alta Mesa."  (ECF No. 50 at 13).  Dunn's argument falls short for two reasons.  First, Dunn relies on Alta Mesa's Limited Partnership Agreement to establish the basis and nature of the fiduciary duty, but the defendants were not parties to the Agreement.  (ECF No. 50 at 2).  Second, the facts do not support any theory that would impute the fiduciary duties from the Agreement or by operation of law to AMR's directors.

The Agreement forms a limited partnership under the laws of Texas and specifically provides that Texas law will govern.  (ECF No. 72-2 at 5).  Under Texas law, "except as provided by . . . a partnership agreement, a general partner of a limited partnership . . . has the liabilities of a partner in a partnership without limited partners."  Tex. Bus. Orgs. Code Ann. § 153.152 (2021).  In other words, subject to the terms of a limited partnership agreement, the general partner of a limited partnership has the same duties of a partner in a general partnership.  Those duties include the duty of loyalty and the duty of care.  Tex. Bus. Orgs. Code Ann. § 152.204 (2021).

Dunn claims that "pursuant to Alta Mesa's limited partnership agreement, the Directors and Officers, as the ultimate persons in control of the partnership, owed Alta Mesa" certain duties as fiduciaries.  (ECF No. 50 at 2).  The Agreement specifically states:

> [T]he *General Partner* shall owe to the Partnership and the Limited Partners duties of loyalty and due care of the type owed by a general partner to a limited partnership under the Act. The Partners agree that the provisions of this Agreement control over such non-contractual duties and liabilities of the General Partner (including fiduciary duties of any kind, whether formal, informal, or based on any pre-existing relationship) . . . .

(ECF No. 72-2 at 12) (emphasis added).  The Agreement clarifies in section 6.2 that the "General Partner shall manage and control the Partnership and its business and affairs in accordance with the standards of the industry, and shall use reasonable, good faith efforts to carry out the business of the Partnership."  (ECF No. 72-2 at 12).  Only the general partner owes fiduciary duties to Alta Mesa.  Nowhere does the Agreement state that directors or officers of AMR owe fiduciary duties to Alta Mesa.  (ECF No. 72-2 at 12).  Similarly, the Texas Business Organizations Code does not impose such a duty on the directors of a parent corporation.

Although Alta Mesa is a Texas limited partnership, AMR is a Delaware corporation.  (Case No. 19-35133, ECF No. 1 at 15).  Under the internal affairs doctrine, AMR's matters of corporate governance, such as fiduciary duties, are governed by Delaware corporate law.  *Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 386 (3d Cir. 2007), as amended (Oct. 12, 2007) ("Under the internal affairs doctrine, anyone controlling a Delaware corporation is subject to Delaware law on fiduciary obligations to the corporation and other relevant stakeholders.").  The parties' arguments on corporate law's treatment of fiduciary duties debate whether they run to subsidiaries.  Under Delaware law, the directors and officers of a corporation act as fiduciaries to the corporation they serve.  *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007).  A parent company owes no fiduciary duties to its wholly owned subsidiary, and the "'directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent.'"  *U.S. Bank Nat. Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 437 (5th Cir. 2014), as revised (Sept. 2, 2014) (applying Delaware

law) (quoting *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988)).  In arguing against the application of this rule to the defendants, Dunn argues that Alta Mesa is not "wholly owned" by AMR.  (ECF No. 71 at 20).  Dunn misconstrues the law on this issue in two respects.

First, Dunn misinterprets the caveat that directors of a wholly owned subsidiary do not owe fiduciary duties to the subsidiary.  The complaint does not allege that the defendants are directors of the *subsidiary* (Alta Mesa), but rather that they are directors of the *parent* (AMR).  (ECF No. 50 at 13).  Dunn cannot use its inverse—that the director of a subsidiary *would* owe fiduciary duties to a subsidiary if it is *not* wholly owned—to argue that the AMR directors owed fiduciary duties in this case.[2]  Second, Dunn takes the general rule—a parent owes no fiduciary duty to its wholly owned subsidiary—and uses it to suggest that because Alta Mesa is not a wholly owned subsidiary, its *parent* must be a fiduciary of the subsidiary.  But that still does not explain how the *directors* of the parent are fiduciaries of the subsidiary.

Simply put, directors of a parent corporation do not owe fiduciary duties running to subsidiaries solely because they are directors.[3]  Multiple levels of entities separate AMR from Alta Mesa.  In that situation, "when dealing with multiple layers of parents and subsidiaries, the corporate veil likely must be pierced at each level."  *Off. Comm. Of Unsecured Creditors of HH Liquidation, LLC v. Comvest Group Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 273 (Bankr. D. Del. 2018) (citing *Faulkner v. Kornman (In re The Heritage Org.)*, 413 B.R. 438,

---

[2] Defendants similarly misuse this rule in their attempt to argue it means they did not owe a fiduciary duty to Alta Mesa.

[3] Even if the Court found that Texas law should instead apply, the law would be the same.  *See Alta Mesa Holdings, LP v. Kingfisher Midstream, LLC (In re Alta Mesa Res., Inc.)*, 613 B.R. 90, 107 (Bankr. S.D. Tex. 2019) ("In Texas, a wholly owned subsidiary does not have interests separate from its owners.  Parent companies do not owe fiduciary duties to their wholly owned subsidiaries.")

514 (Bankr. N.D. Tex. 2009)).  The court in *In re HH Liquidation* declined to find that directors

and officers of a parent corporation owed fiduciary duties to subsidiary debtor entities when an

unsecured creditor's committee tried to bring breach of fiduciary duty claims against them.  *HH*

*Liquidation*, 590 B.R. at 273.  The court reasoned that because the parent did not owe duties to the

subsidiary, the directors of the parent did not either.  *Id.*  To hold the directors liable for any actions

related to the subsidiary, the plaintiff would have to pierce the corporate veil.  *Id.*  Because the

committee had not asserted any veil-piercing claim, the court found no justification to "blithely

ignore corporate formalities."  *Id.* at 273 (quoting *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,

906 A.2d 168, 194 (Del. Ch. 2006)).

Often, the distinction between being an officer of the parent and an officer of the child

would not have an economic effect.  If the parent entity breaches a duty to the child, the parent

entity (in this case AMR) might be liable to the child (Alta Mesa).  If AMR's directors and officers

allowed that breach to occur (creating AMR liability for the breach), then AMR's officers and

directors could possibly be sued by (i) AMR; or (ii) an unsatisfied judgment creditor acting

derivatively.  The problem in this case is that AMR was released from all liability by Alta Mesa.

(ECF No. 1757 at 12, 57).  Dunn is attempting to sue AMR's officers and directors directly because

no derivative suit exists as a result of the release.  Dunn has not successfully navigated such a

difficult journey around the AMR release.

## B.     The Alta Mesa GP Officers

Chappelle, Ellis, and Hackett each served as a manager or officer of Alta Mesa GP at the

time of the alleged breach.  (ECF No. 50 at 13).  As with the AMR directors, nowhere does the

Agreement state that the officers of the general partner owe a fiduciary duty to Alta Mesa, nor does

the law impose such a duty.  Dunn argues that if the defendants did not owe fiduciary duties to

Alta Mesa, then no one did.  (ECF No. 71 at 3).  This is not the case.  The directors and officers of Alta Mesa owed Alta Mesa fiduciary duties.  Likewise, Alta Mesa GP owed fiduciary duties to Alta Mesa as general partner of Alta Mesa.  However, Dunn did not assert a claim against Alta Mesa GP.  Instead, Dunn argues that the defendants themselves owed fiduciary duties running directly to a subsidiary.

Dunn argues that "the several levels of general partners that existed between Alta Mesa and AMR do not insulate Defendants from liability to Alta Mesa."  (ECF No. 71 at 26).  In *McBeth v. Carpenter*, the Fifth Circuit found that "under Texas law, the usual general partner fiduciary duties apply in this two-tiered structure where [defendant] was acting as the general partner of a general partner."  565 F.3d 171, 178 (5th Cir. 2009).  This case is distinguishable.  *McBeth* involves an individual general partner of a general partner of the partnership to which the Fifth Circuit found the individual owed a fiduciary duty.  *Id.*  Here, while there are "tiers" in the organizational structure, the defendants are not themselves general partners of any entity within that structure. They were (i) officers of the LLC that is Alta Mesa's general partner and (ii) directors of AMR. Neither of those relationships is analogous to *McBeth*.  General partners in general partnerships do not enjoy the same limited liability as officers and directors of LLCs and corporations.  *Compare* Del. Code Ann. tit. 8, § 325 (2021) (limiting the liability of corporate directors and officers), *and* Del. Code Ann. tit. 6, § 18-303 (2021) (limiting the liability of members of an LLC), *with* Tex. Bus. Orgs. Code Ann. § 152.304 (2021) (providing that general "partners are jointly and severally liable for all obligations of the partnership").

To make a plausible claim against the officers of Alta Mesa GP, Dunn would have to first argue that Alta Mesa GP breached its fiduciary duties to Alta Mesa.  *See Grierson v. Parker Energy Partners 1984-I*, 737 S.W.2d 375, 378 (Tex. App.—Houston [14th Dist.] 1987, no writ) (reasoning

that holding a corporate officer directly liable to a subsidiary without piercing the veil requires knowing participation in the corporation's breach of *its* fiduciary duty to the subsidiary of which the corporation is a general partner). Dunn "only seeks to hold defendants liable for breaching the duties they personally owed to Alta Mesa." (ECF No. 71 at 26). This is perhaps because both AMR and Alta Mesa GP received a release from liability under the plan. (Case No. 19-35133, ECF No. 1562 at 9).

To the extent Dunn attempts to argue that the defendants owed fiduciary duties to Alta Mesa through their roles as either directors of AMR or officers of Alta Mesa GP, Dunn fails to state a claim for relief. As Dimitrievich, Lapeyre, Hackett, and Leuschen only served in those capacities, the Court grants the motion to dismiss those four defendants.

###   C.   The Alta Mesa Officers

Claims against the officers of Alta Mesa (Chappelle, Ellis, and Turner) for breach of fiduciary duties to Alta Mesa are different than claims against the officers and directors of Alta Mesa GP and AMR. Dunn's claims against the Alta Mesa officers do not suffer the same defects as the claims against the directors and officers of the parent companies because the alleged duty runs directly from the defendants to the company for which they serve as officers.

###   *(1)   Statutory Basis for Fiduciary Duty*

The Texas Business Organizations Code states that "a partnership may have elected or appointed officers." Tex. Bus. Orgs. Code Ann. § 151.004 (2021). An officer "shall perform the duties in the management of the entity and has the authority as provided by the governing documents of the entity." Tex. Bus. Orgs. Code Ann. § 3.103 (2021). The terms of Alta Mesa's Agreement only imposed and outlined the fiduciary duties of the general partner. Nowhere does

the Agreement impose fiduciary duties on the officers of Alta Mesa.  Nor does Dunn allege that any other contract or agreement exists which imposes fiduciary duties on the officers of Alta Mesa.

Neither the statute nor Agreement impose fiduciary duties on Chappelle, Ellis, and Turner as officers of Alta Mesa.  Common law must impose duties if Dunn's claim against them is to survive.

### (2)  *"Control" As A Basis for Fiduciary Duties*

Dunn argues that the defendants' control over Alta Mesa means that they had fiduciary duties to Alta Mesa.  While Texas law supports this theory, the issue is whether Dunn has sufficiently plead factual allegations to plausibly support it.

The Fifth Circuit found in *Harwood* that

> [A]n officer of a corporate general partner who is entrusted with the management of the limited partnership and who exercises control over the limited partnership . . . owes a fiduciary duty to the partnership . . . . We emphasize that it is not only the control that the officer actually exerts over the partnership, but also the confidence and trust placed in the hands of the controlling officer. . . .

*FNFS, LTD. v. Harwood (In re Harwood)*, 637 F.3d 615, 622 (5th Cir. 2011).  Here, the Fifth Circuit's ruling decided whether a debt was dischargeable under § 523(a)(3) of the Bankruptcy Code.  *Id.* at 622.  The court had to determine whether the defendant incurred certain debts through an abuse of a fiduciary position, making the debts an exception to discharge.  *Id.*  The Fifth Circuit reasoned that if a fiduciary relationship existed which would affect the § 523 analysis, it would have had to exist before the alleged fraud or else the duty would merely be a remedial measure in the form of a constructive trust, not a "fiduciary" duty.  *Id.*  Because the court did not rely on the fraud or procedural context of *Harwood* to find that a fiduciary relationship existed, this Court may rely on the framework it provided to find that the defendants plausibly owed similar duties in this case.

The Fifth Circuit based its analysis on facts which tended to show the defendant exercised control over a limited partnership. *Id.* at 623. The defendant was given management authority, he had sole authority over the partnership's daily operations, the board did nothing to limit the defendant's power over the partnership, the defendant exercised control over the funds of the partnership, and he held himself out as the president of the partnership—which the court found compelling even though he was not actually the president. *Id.*

Dunn pleads numerous factual allegations that demonstrate the high degree of control that Chappelle, Ellis, and Turner exercised over the operations of Alta Mesa. Dunn alleges that they were involved in the decision-making process at every stage of the drilling program from the testing that began before the merger to the decision to install ESPs when production fell below projected levels. (ECF No. 50). They were charged with presenting information on the program to the board of AMR and to investors. (ECF No. 50 at 43). There is no indication that the board did anything to interfere with the officers' control until almost a year after they approved the drilling program. (ECF No. 50). Unlike the defendant in *Harwood*, the defendants did far more than "hold themselves out" as officers of Alta Mesa. They actually were officers of Alta Mesa, and exercised power in that capacity. (ECF No. 50 at 13).

The totality of the circumstances, if proven, would support a finding of a fiduciary relationship. To clarify, the Court does not base its analysis on the directors' positions or purported positions as officers of Alta Mesa GP.[4] That fact is merely another marker of the control the

---

[4] Dunn alleges that Turner was a "de facto" officer of Alta Mesa GP. (ECF No. 50 at 15). Because Dunn pleads no factual allegations in support of that contention, the Court is not persuaded. However, Turner may have owed a duty to Alta Mesa under the "control" theory.

defendants exercised over Alta Mesa in their capacity as officers of Alta Mesa directly.[5]  Dunn's complaint sufficiently alleges facts to support the claim that Chappelle, Ellis, and Turner owed fiduciary duties, looking to the totality of the nature of their relationship to Alta Mesa.

## II.    BREACH

The defendants argue in the alternative that, even if they did owe fiduciary duties to Alta Mesa, they did not breach those duties.  The defendants argue that Dunn's complaint fails to overcome the presumption against breach the business judgment rule provides.

### A.  The Business Judgment Rule

The Texas Business Organizations Code codifies the internal affairs doctrine and provides that Texas law "governs the formation and internal affairs of an entity" formed under a certificate filed under the laws of Texas.  Tex. Bus. Orgs. Code Ann. § 1.101 (2021).  Texas limited partnerships, as entities formed by filing certificates, are subject to the internal affairs doctrine. Tex. Bus. Orgs. Code Ann. § 152.802 (2021).  Therefore, Texas law governs the dispute as to whether the officers of a Texas limited partnership breached fiduciary duties to the partnership. *Herington v. Univar Solutions Inc.*, 2021 WL 3828702, at *2 (S.D. Tex. May 20, 2021) ("The internal affairs doctrine applies to breach of fiduciary duty claims.").  The two primary fiduciary duties in Texas are the duty of care and the duty of loyalty.  *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984).  In Texas, the business judgment rule is treated as a "rule of substantive law that requires a plaintiff . . . to plead and prove (1) that the conduct . . . was

---

[5] The officers of a limited partnership are not statutorily shielded from liability as the officers of an LLC or corporation are, so there is no barrier to liability here that would require Dunn to bring a veil piercing claim as with the AMR directors and Alta Mesa GP officers. *Compare* Del. Code Ann. tit. 8, § 325 (2021) (limiting the liability of corporate directors and officers), *and* Del. Code Ann. tit. 6, § 18-303 (2021) (limiting the liability of members of an LLC), *with* Tex. Bus. Orgs. Code Ann. § 153 (providing no limited liability provision for officers of a limited partnership).

outside the exercise of judgment and discretion the rule is meant to protect, or (2) that the directors had a personal interest in the transactions complained of." *Resol. Tr. Corp. v. Norris*, 830 F. Supp. 351, 356 (S.D. Tex. 1993). Therefore, Dunn must plead around the business judgment rule in alleging the officers breached either their duty of care or their duty of loyalty to survive dismissal.

Few Texas courts have analyzed what a plaintiff must allege at the pleading stage to rebut the business judgment rule outside of the shareholder derivative suit context and where there are no allegations that the directors acted in self-interest (e.g., were on both sides of a transaction). There is some debate as to whether, in this context, an allegation of gross negligence is enough to overcome the business judgment rule. *See, e.g., Resol. Tr. Corp.*, 830 F. Supp. at 358 ("The court has not found any Texas or Fifth Circuit cases directly addressing whether the Texas business judgment rule precludes a cause of action for gross negligence.").

### *(1)    The Duty of Care*

To abide by the duty of care, directors generally must "inform themselves, before making a business decision, of all material information reasonably available to them." *Katchadurian v. NGP Energy Cap. Mgmt., LLC (In re Northstar Offshore Group, LLC)*, 616 B.R. 695, 741 (*citing TVI Corp. v. Gallagher*, No. 7798-VCP, 2013 WL 5809271, at *13 (Del. Ch. Oct. 28, 2013)).

In *Northstar*, this Court held that the trustee had not sufficiently plead around the business judgment rule because

> [The Trustee's] allegations [were] focused on the outcome of the directors' decisions, rather than on the process of the directors' decisions. To properly allege a breach of the duty of care, such that it would rebut the business judgment rule presumption, the Complaint must allege facts, that, taken as true, demonstrate egregiousness in the process, not the outcome. The outcome of a decision is exactly what the business judgment rule is designed to protect.

*Id.* at 742. A poor decision that leads to a bad outcome is not a breach; failing to properly gather and analyze information while making that decision is a breach. In *Northstar*, this Court reasoned

that the core of the trustee's allegations was that the directors were not misinformed or underinformed, but rather that their decisions were motivated by self-interest and bad faith. *Id.* The Court noted that this raised the issue of the duty of loyalty, not the duty of care. *Id.*

The Complaint indicates that Chappelle, Ellis, and Turner went to great effort to inform themselves and had intricate knowledge of how the wells were performing. (ECF No. 50). They did not breach their duty of care simply because their decisions turned out poorly. Alternatively, Dunn alleges that having gathered and analyzed all the information necessary to make an informed business decision, Chappelle, Ellis, and Turner failed to disclose that information to the AMR directors and investors and even actively withheld and hid that information from the AMR directors. (ECF No. 50 at 39–43). Like *Northstar*, Dunn raises the issue of the duty of loyalty rather than the duty of care.

### (2)   *The Duty of Loyalty*

"The duty of loyalty dictates that a director must act in good faith and must not allow his personal interests to prevail over the interests of the corporation." *Gearhart*, 741 F.2d at 719. The business judgment rule does not apply to self-dealing transactions. *Northstar*, 616 B.R. at 739. Because the duty of loyalty is most commonly called into question in instances involving self-dealing, the business judgment rule does not typically apply to the duty of loyalty. Here, there are no allegations that the officers were self-interested, and there is little case law addressing what constitutes "good faith" in this context. The duty of loyalty in Texas includes duties of candor and disclosure. *Chapman v. Arfeen*, No. 09-16-00272-CV, 2018 WL 4139001, at *15 (Tex. App.—Beaumont Aug. 30, 2018, pet. denied); *see also McBeth*, 565 F.3d at 178 (reasoning that, as fiduciaries, partners in a limited partnership owe one another a duty of disclosure). Deciding whether to share specific information is itself a business decision. *Schlumberger Tech. Corp. v.*

*Swanson*, 959 S.W.2d 171, 181 (1997). Because disclosure is a business decision, to the extent the allegations of breach of the duty to disclose do not allege self-dealing, the business judgement rule applies. A complaint successfully pleads around the business judgment rule where the facts support an inference that the officers acted dishonestly or deceptively in the withholding of information. *Chapman*, 2018 WL 4139001, at *15 (citing *Sneed v. Webre*, 465 S.W.3d 169, 178 (Tex. 2015)).

The issue is whether having properly and thoroughly informed themselves, Chappelle, Ellis, and Turner breached their duty of loyalty. Dunn does not suggest that Chappelle, Ellis, and Turner engaged in self-dealing transactions with respect to the implementation and execution of the drilling program. If they breached the duty of loyalty, Dunn must allege facts supporting a breach of the duties of candor and disclosure.

Dunn alleges not only that Chappelle, Ellis, and Turner withheld information from the board, but further suggests they intentionally manipulated data presented to the AMR board and to investors to obscure the fact that the drilling program's performance fell below projections. (ECF No. 50 at 32–41). Specifically, the complaint alleges that Chappelle and Turner decided to present "cleaned up" data. (ECF No. 50 at 32). They cut off a graph comparing well production to type curves right before the point where the graph showed actual production falling below the type curves. (ECF No. 50 at 32–33). They also recalculated average production from the wells by removing the poorest performing wells from that calculation. (ECF No. 50 at 32). Additionally, the complaint alleges that Ellis knew the patterns were underperforming and did not inform the board, and he participated in presentations of manipulated data to the investors and the board knowing the data had been similarly "cleaned up." (ECF No. 50 at 45). These factual allegations involve dishonesty and deception and call into question whether the officers acted in good faith

or, as the trustee alleges, in an effort to save their jobs.  (ECF No. 50 at 45).  Motive will be a matter for trial.   But, the complaint sufficiently overcomes the business judgment rule's presumption to plausibly plead a breach of the duty of loyalty with respect to defendants Chappelle, Ellis, and Turner.

## **CONCLUSION**

The Court dismisses the claims against Dimitrievich, Lapeyre, Hackett, and Leuschen without prejudice.   The Court denies the motion to dismiss the claims against defendants Chappelle, Ellis, and Turner.

A separate order will be entered.


SIGNED 10/13/2022


_____
Marvin Isgur
United States Bankruptcy Judge